# ARIZONA *v.* CALIFORNIA ET AL.

No. 8, Orig.   Argued December 8, 1982—Decided March 30, 1983

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and O'CONNOR, JJ., joined, and in Part III of which BRENNAN, BLACKMUN, and STEVENS, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which BLACK-MUN and STEVENS, JJ., joined, *post*, p. 642. MARSHALL, J., took no part in the consideration or decision of the case.

*Carl Boronkay* and *Ralph E. Hunsaker* argued the cause for the State of Arizona et al. With Mr. Boronkay on the brief for the California Agencies were *Warren J. Abbott, Maurice C. Sherrill, Justin McCarthy, Ira Reiner, Gilbert W. Lee, John W. Witt, C. M. Fitzpatrick,* and *Joseph Kase, Jr.* With Messrs. Hunsaker and Boronkay on the briefs for the State of Arizona et al. were *George Deukmejian,* Attorney General of California, *R. H. Connett* and *N. Gregory Taylor,* Assistant Attorneys General, *Douglas B. Noble* and *Emil Stipanovich, Jr.,* Deputy Attorneys General, *Roy H. Mann,* Messrs. Reiner, Lee, Witt, Fitzpatrick, Sherrill, McCarthy, and Kase, *Richard Bryan,* Attorney General of Nevada, and *James LaVelle,* Chief Deputy Attorney General. Mr. Hunsaker filed a brief for the State of Arizona.

*Lawrence A. Aschenbrenner* argued the cause for the Chemehuevi Indian Tribe et al. With him on the briefs were *Arlinda F. Locklear, John J. Mullins, Jr., Thomas W. Fredericks, Robert S. Pelcyger,* and *Raymond C. Simpson.* Mr. Simpson filed a brief for the Quechan Tribe.

*Deputy Solicitor General Claiborne* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Dinkins, Myles E. Flint, Tom W. Echohawk,* and *Scott B. McElroy.**

JUSTICE WHITE delivered the opinion of the Court.

The problem of irrigating the arid lands of the Colorado River Basin has been confronted by the peoples of that region

---

*Briefs of *amici curiae* were filed by *Michael R. Thorp* for the Pyramid Lake Tribe; and by *M. Byron Lewis* and *John B. Weldon, Jr.,* for the Salt River Project Agricultural Improvement and Power District et al.

for 2,000 years and by Congress and this Court for many decades. Today we conclude another chapter in this original action brought to determine rights to the waters of the Colorado River. In earlier proceedings in this case, the United States, an intervenor in the principal action, acquired water rights for five Indian reservations that are dependent upon the river for their water. The United States, and the Tribes which ask to intervene in the action, now seek to have those water rights increased.

I

The Colorado River Compact of 1922 divided the waters of the Colorado River between the Upper- and Lower-Basin States, but fell short of apportioning the respective shares among the individual States. Nor did the Boulder Canyon Project Act of 1928, 45 Stat. 1057, as amended, 43 U. S. C. § 617 et seq. (1976 ed. and Supp. V) (Project Act), a vast federal effort to harness and put to use the waters of the lower Colorado River, expressly effect such an apportionment. The principal dispute that became increasingly pressing over the years concerned the respective shares of the Lower-Basin States, particularly the shares of California and Arizona.

This litigation began in 1952 when Arizona, to settle this dispute, invoked our original jurisdiction, U. S. Const., Art. III, § 2, cl. 2, by filing a motion for leave to file a bill of complaint against California and seven public agencies of the State.[1] Arizona sought to confirm its title to water in the Colorado River system and to limit California's annual consumptive use of the river's waters. Nevada intervened, praying for determination of its water rights; Utah and New Mexico were joined as defendants; and the United States intervened, seeking water rights on behalf of various federal establishments, including the reservations of five Indian

---

[1] Palo Verde Irrigation District, Imperial Irrigation District, Coachella Valley County Water District, Metropolitan Water District of Southern California, City of Los Angeles, City of San Diego, and County of San Diego.

Tribes—the Colorado River Indian Tribes, Fort Mojave Indian Tribe, Chemehuevi Indian Tribe, Cocopah Indian Tribe, and Fort Yuma (Quechan) Indian Tribe.

After lengthy proceedings, Special Master Simon Rifkind filed a report recommending a certain division of the Colorado River waters among California, Arizona, and Nevada. The parties' respective exceptions to the Master's report were extensively briefed and the case was twice argued. The Court for the most part agreed with the Special Master, 373 U. S. 546 (1963), and our views were carried forward in the decree found at 376 U. S. 340 (1964).

The long and rich story of the efforts on behalf of the States involved to arrive at a mutually satisfactory plan of apportionment is set forth in the Special Master's report and the Court's opinion and need not be repeated here. We agreed with the Special Master that the allocation of Colorado River water was to be governed by the standards set forth in the Project Act rather than by the principles of equitable apportionment which in the absence of statutory directive this Court has applied to disputes between States over entitlement to water from interstate streams. Nor was the local law of prior appropriation necessarily controlling. The Project Act itself was held to have created a comprehensive scheme for the apportionment among California, Nevada, and Arizona of the Lower Basin's share of the mainstream waters of the Colorado River, leaving each State its tributaries. Congress had decided that a fair division of the first 7.5 million acre-feet of such mainstream waters would give 4.4 million acre-feet to California, 2.8 million acre-feet to Arizona, and 300,000 acre-feet to Nevada. Arizona and California would share equally in any surplus. 373 U. S., at 565.

Over strong objection, we also agreed with the Special Master that the United States had reserved water rights for the Indian reservations, effective as of the time of their creation. *Id.*, at 598–600. See *Winters* v. *United States*, 207 U. S. 564 (1908). These water rights, having vested before

the Project Act became effective on June 25, 1929, were ranked with other "present perfected rights,"[2] and as such were entitled to priority under the Act.  373 U. S., at 600. Rejecting more restrictive standards for measuring the water rights intended to be reserved for the reservations, we agreed with the Master and the United States, speaking on behalf of the Tribes, that the "only feasible and fair way by which reserved water for the reservations can be measured is irrigable acreage." *Id.*, at 601.  We further sustained the Master's findings, arrived at after full, adversary proceedings, as to the various acreages of practicably irrigable land on the different reservations. *Ibid.*  These findings were subsequently incorporated in our decree of March 9, 1964. Article II(D) of our decree specified each reservation's entitlement to diversions from the mainstream.

Not all aspects of the case were finally resolved in the 1964 decree.  First, in the course of determining irrigable acreage on the reservations, the Master resolved a dispute between the United States and the States with respect to the boundaries of the Colorado River and Fort Mojave Indian Reservations, generally finding that the reservations were smaller than the United States claimed them to be.  Although we based the water rights decreed to these two reservations on the irrigable acreage within the boundaries determined by the Special Master, we found that it had been "unnecessary" for the Special Master finally to have determined these

---

[2] A "perfected right" is a "water right acquired in accordance with state law, which right has been exercised by the actual diversion of a specific quantity of water that has been applied to a defined area of land or to definite municipal or industrial works, and in addition shall include water rights created by the reservation of mainstream water for the use of federal establishments under federal law whether or not the water has been applied to beneficial use." 376 U. S., at 341.  "Present perfected rights" means perfected rights in existence as of June 25, 1929, the effective date of the Project Act. *Ibid.*

boundaries[3] and provided in Article II(D) that the quantities of water provided for the Fort Mojave Indian Reservation and the Colorado River Indian Reservation "shall be subject to appropriate adjustment by agreement or decree of this Court in the event that the boundaries of the respective reservations are finally determined." 376 U. S., at 345. See Part V, *infra*. Second, Article VI of the decree provided that the parties, within two years, should provide the Court with a list of the outstanding present perfected rights in the mainstream waters. Finally, in Article IX of the decree we retained jurisdiction over the case for the purpose of further modifications and orders that we deemed proper.

On January 9, 1979, we entered a supplemental decree identifying the present perfected rights to the use of the mainstream water in each State and their priority dates as agreed to by the parties. 439 U. S. 419. We also decreed that, in the event of shortage, the Secretary of the Interior shall, before providing for the satisfaction of these present perfected rights, first provide for the satisfaction in full of the Indian water rights set forth in the 1964 decree for the five reservations. We expressly noted that these quantities, fixed in paragraphs 1 through 5 of Article II(D) of the 1964 decree "shall continue to be subject to appropriate adjustment by agreement or decree of this Court in the event that the boundaries of the respective reservations are finally determined." 439 U. S., at 421. The 1979 decree thus resolved outstanding issues in the litigation. But before that decree was entered new questions arose: The five Indian Tribes, ultimately joined by the United States, made claims for additional water rights to reservation lands.

---

[3] "We disagree with the Master's decision to determine the disputed boundaries of the Colorado River Indian Reservation and the Fort Mohave Indian Reservation. We hold that it is unnecessary to resolve those disputes here. Should a dispute over title arise because of some future refusal by the Secretary to deliver water to either area, the dispute can be settled at that time." 373 U. S., at 601.

Because the United States had represented their interests, the Indian Tribes previously had no part in the litigation. In 1977, however, the Fort Mojave, Chemehuevi, and Quechan (Fort Yuma) Indian Tribes moved for leave to intervene as indispensable parties. By April 10, 1978, the Colorado River Indian Tribes and the Cocopah Indian Tribe had also filed petitions for intervention. Three of the Tribes sought intervention to oppose entry of the 1979 decree that was to set the priority order for water rights in the Colorado River. The Tribes also raised claims for additional water rights appurtenant to two types of land: (1) the so-called "omitted" lands—irrigable lands, within the recognized 1964 boundaries of the reservations, for which it was said that the United States failed to claim water rights in the earlier litigation; and (2) "boundary" lands—lands that were or should have been officially recognized as part of the reservations and that had assertedly been finally determined to lie within the reservations within the meaning of the 1964 decree.

Initially, both the state parties and the United States opposed intervention. Subsequently, the United States dropped its opposition to the Tribes' intervention. Still later, on December 22, 1978, the United States joined the Indians in moving for a supplemental decree to grant additional water rights to the reservations. In our 1979 decree, we denied the motion of the Fort Mojave, Chemehuevi, and Quechan Tribes to intervene insofar as they sought to oppose entry of the supplemental decree. Other matters raised by their motion, as well as that of the United States' and the other two Tribes, were not resolved. We appointed Senior Judge Elbert P. Tuttle Special Master and referred these motions to him. 439 U. S., at 436–437.

II

After conducting hearings, the Special Master issued a preliminary report on August 28, 1979, granting the Indian Tribes leave to intervene in subsequent hearings on the

merits. In addition, the Special Master concluded that certain boundaries of the reservations had now been finally determined within the meaning of Article II(D) of the 1964 decree, primarily because of administrative decisions taken by the Secretary of the Interior. These decisions purported considerably to enlarge the reservations affected and, with respect to the Colorado River and Mojave Reservations, were for the most part reassertions of the positions submitted by the United States to Special Master Rifkind, rejected by him, and left open by us to later final resolution. We refused to allow the States to file exceptions at that time, 444 U. S. 1009 (1980), and the Special Master held further hearings on the merits.

On February 22, 1982, the Special Master issued his final report. The Special Master's findings were almost entirely consistent with the position of the United States and the Indian Tribes. Rejecting the States' strong objections to reopening the question of whether more practicable irrigable acreage actually existed than the United States claimed, Special Master Rifkind found, and our 1963 opinion and 1964 decree specified, the Special Master concluded that each of the Tribes was entitled to additional water rights based on land that he determined to be irrigable over and beyond that previously found. Furthermore, based on his earlier boundary determination, the Master determined that there was additional practicably irrigable acreage for which the Indians were entitled to further water rights. The States have filed exceptions to both of these determinations, as well as to various factual findings concerning the amount of practicably irrigable acreage.

## III

The States have also refiled their exceptions to the Special Master's preliminary findings allowing the Indian Tribes to intervene in the action. We consider this matter first.

We agree with the Special Master that the Indian Tribes' motions to intervene should be granted. The States oppose

the motions and insist that, without their consent, the Tribes' participation violates the Eleventh Amendment.[4] Assuming, *arguendo*, that a State may interpose its immunity to bar a suit brought against it by an Indian tribe, *United States* v. *Minnesota*, 270 U. S. 181, 193–195 (1926), the States involved no longer may assert that immunity with respect to the subject matter of this action. Water right claims for the Tribes were brought by the United States. Nothing in the Eleventh Amendment "has ever been seriously supposed to prevent a State's being sued by the United States." *United States* v. *Mississippi*, 380 U. S. 128, 140 (1965). See, *e. g.*, *United States* v. *Texas*, 143 U. S. 621, 646 (1892); *United States* v. *California*, 297 U. S. 175 (1936); *United States* v. *California*, 332 U. S. 19, 26–28 (1947). The Tribes do not seek to bring new claims or issues against the States, but only ask leave to participate in an adjudication of their vital water rights that was commenced by the United States. Therefore, our judicial power over the controversy is not enlarged by granting leave to intervene, and the States' sovereign immunity protected by the Eleventh Amendment is not compromised. See, *e. g.*, *Maryland* v. *Louisiana*, 451 U. S. 725, 745, n. 21 (1981).

The States also oppose intervention on grounds that the presence of the United States insures adequate representation of the Tribes' interests. The States maintain that the prerequisites for intervention as of right set forth in Rule 24 of the Federal Rules of Civil Procedure are not satisfied. Aside from the fact that our own Rules make clear that the Federal Rules are only a guide to procedures in an original action, see this Court's Rule 9.2; *Utah* v. *United States*, 394 U. S. 89, 95 (1969), it is obvious that the Indian Tribes, at a minimum, satisfy the standards for permissive intervention

---

[4] There are suggestions in the papers that the States' sovereign immunity is in some respect distinct from the immunity afforded by the Eleventh Amendment. Insofar as the question of intervention posed here is concerned, we appreciate no such difference.

set forth in the Federal Rules.  The Tribes' interests in the water of the Colorado basin have been and will continue to be determined in this litigation since the United States' action as their representative will bind the Tribes to any judgment. *Heckman* v. *United States*, 224 U. S. 413, 444–445 (1912). Moreover, the Indians are entitled " 'to take their place as independent qualified members of the modern body politic.' " *Poafpybitty* v. *Skelly Oil Co.*, 390 U. S. 365, 369 (1968), quoting *Board of County Comm'rs* v. *Seber*, 318 U. S. 705, 715 (1943).  Accordingly, the Indians' participation in litigation critical to their welfare should not be discouraged.[5]  The States have failed to present any persuasive reason why their interests would be prejudiced or this litigation unduly delayed by the Tribes' presence.  The Tribes' motions to intervene are sufficiently timely with respect to this phase of the litigation.  Of course, permission to intervene does not carry with it the right to relitigate matters already determined in the case, unless those matters would otherwise be subject to reconsideration.  The motions to intervene are granted.

## IV

We turn now to the first major question in the case: whether the determination of practicably irrigable acreage within recognized reservation boundaries should be reopened to consider claims for "omitted" lands for which water rights could have been sought in the litigation preceding the 1964 decree.  The Special Master agreed with the United States and the Tribes that it is not too late in the day to modify the 1964 adjudication and decree, notwithstanding his own finding that "[t]he claim in the original case . . . embraced the totality of water rights for the Reservation lands."  Tuttle Report, at 31.  We disagree with the Special Master and sus-

---

[5] For this reason, the States' reliance on *New Jersey* v. *New York*, 345 U. S. 369 (1953) *(per curiam)*, where the Court denied the city of Philadelphia's request to intervene in that interstate water dispute on the grounds that its interests were adequately represented by the State of Pennsylvania, is misplaced.

tain the exceptions filed by the States and state agencies to his conclusion. In our opinion, the prior determination of Indian water rights in the 1964 decree precludes relitigation of the irrigable acreage issue.

*Arizona* v. *California*, unlike many other disputes over water rights that we have adjudicated, has been and continues to be governed mainly by statutory considerations. The primary issue in the case—the allocation of the waters of the Lower Colorado River Basin among the States—was resolved by the distribution of waters intended by Congress and written into the Project Act. The question of Indian water rights—an important but ancillary concern—was also decided by recourse to congressional policy rather than judicial equity. We held that the creation of the reservations by the Federal Government implied an allotment of water necessary to "make the reservation livable." 373 U. S., at 599–600. See *Winters* v. *United States*, 207 U. S. 564 (1908); *Cappaert* v. *United States*, 426 U. S. 128, 141 (1976). We rejected the argument, urged by the States, that equitable apportionment should govern the question. We were "not convinced by Arizona's argument that each reservation is so much like a State that its rights to water should be determined by the doctrine of equitable apportionment." 373 U. S., at 597. "Moreover, even were we to treat an Indian reservation like a State, equitable apportionment would still not control, since, under our view, the Indian claims here are governed by the statutes and Executive Orders creating the reservations." *Ibid.*

We went on to reject Arizona's further arguments that (1) the doctrine of *Pollard's Lessee* v. *Hagan*, 3 How. 212 (1845), and *Shively* v. *Bowlby*, 152 U. S. 1 (1894), prevented the Federal Government from reserving waters for federally reserved lands, 373 U. S., at 597; (2) water rights could not be reserved by Executive Order, *id.*, at 598; and (3) there was insufficient evidence that the United States intended to reserve water for the Tribes, *id.*, at 598–600.

The standard for quantifying the reserved water rights was also hotly contested by the States, who argued that the Master adopted a much too liberal measure. Our decision to rely upon the amount of practicably irrigable acreage contained within the reservation constituted a rejection of Arizona's proposal that the quantity of water reserved should be measured by the Indians' "reasonably foreseeable needs," *i. e.*, by the number of Indians. The practicably-irrigable-acreage standard was preferable because how many Indians there will be and what their future needs will be could "only be guessed," *id.*, at 601. By contrast, the irrigable-acreage standard allowed a present water allocation that would be appropriate for future water needs. *Id.*, at 600–601. Therefore, with respect to the question of reserved rights for the reservations, and the measurement of those rights, the Indians, as represented by the United States, won what can be described only as a complete victory. A victory, it should be stressed, that was in part attributable to the Court's interest in a *fixed* calculation of future water needs. Applying the irrigable-acreage standard, we found that the Master's determination as to the amount of practicably irrigable acreage, an issue also subject to adversary proceedings, was reasonable. Our subsequent decree reflected this judgment. 376 U. S. 340 (1964).

The Tribes and the United States now claim that certain practicably irrigable acreage was "omitted" from those calculations.[6] There is no question that if these claims were presented in a different proceeding, a court would be without power to reopen the matter due to the operation of res judicata. That would be true here were it not for Article IX of the 1964 decree which provides:[7]

---

[6] The United States attributes the omission of irrigable acreage to the complexity of the case. The state parties maintain that the omission was in part a tactical decision made to portray the irrigable-acreage standard as a reasonable basis for calculating the reservations' water needs.

[7] The parties do not contend that absent Article IX the decree would not be final. Although this Court had not entered a decree on other present

> "Any of the parties may apply at the foot of this decree for its amendment or for further relief. The Court retains jurisdiction of this suit for the purpose of any order, direction, or modification of the decree, or any supplementary decree, that may at any time be deemed proper in relation to the subject matter in controversy."

We agree with the United States and the Tribes that this provision grants us power to correct certain errors, to determine reserved questions, and, if necessary, to make modifications in the decree. We differ in our understanding of the circumstances which make exercise of this power appropriate.

The Special Master believed that the decision whether to exercise that discretion should be governed by "law of the case" principles. Unlike the more precise requirements of res judicata, law of the case is an amorphous concept. As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. See 1B J. Moore & T. Currier, Moore's Federal Practice ¶ 0.404 (1982) (hereinafter Moore).[8] Law of the case directs a court's discretion, it does not limit the tribunal's power. *Southern R. Co.* v. *Clift,* 260 U. S. 316, 319 (1922); *Messenger* v. *Anderson,* 225 U. S. 436, 444 (1912). In that sense, the doctrine might appear applicable here. But law of the case doctrine was understandably crafted with

---

perfected rights, 439 U. S. 419 (1979), at the time the United States moved to reopen the irrigable-acreage question, the pendency of the former does not undermine the finality of our earlier determination of the latter. See Restatement (Second) of Judgments § 13, Comment *e* (1982) ("A judgment may be final in a res judicata sense as to a part of an action although the litigation continues as to the rest").

[8] Under law of the case doctrine, as now most commonly understood, it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice. See, *e. g., White* v. *Murtha,* 377 F. 2d 428, 431–432 (CA5 1967).

the course of ordinary litigation in mind. Such litigation proceeds through preliminary stages, generally matures at trial, and produces a judgment, to which, after appeal, the binding finality of res judicata and collateral estoppel will attach. To extrapolate wholesale law of the case into the situation of our original jurisdiction, where jurisdiction to accommodate changed circumstances is often retained,[9] would weaken to an intolerable extent the finality of our decrees in original actions, particularly in a case such as this turning on statutory rather than Court-fashioned equitable criteria.

For the following reasons, we hold that Article IX must be given a narrower reading and should be subject to the general principles of finality and repose, absent changed circumstances or unforeseen issues not previously litigated.

First, while the the technical rules of preclusion are not strictly applicable, the principles upon which these rules are founded should inform our decision. It is clear that res judicata and collateral estoppel do not apply if a party moves the rendering court in the same proceeding to correct or modify its judgment. 1B Moore ¶ 0.407, pp. 931–935; R. Field, B. Kaplan, & K. Clermont, Materials on Civil Procedure 860 (4th ed. 1978). Nevertheless, a fundamental precept of common-law adjudication is that an issue once determined by a competent court is conclusive. *Montana* v. *United States*, 440 U. S. 147, 153 (1979); *Federated Department Stores, Inc.* v. *Moitie*, 452 U. S. 394, 398 (1981); *Cromwell* v. *County of Sac*, 94 U. S. 351, 352–353 (1877). "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana* v. *United States, supra,* at 153–154.

---

[9] Of course, this case does not present the issue of the proper standard to be applied when a district court issues an equitable decree and retains jurisdiction.

In no context is this more true than with respect to rights in real property. Abraham Lincoln once described with scorn those who sat in the basements of courthouses combing property records to upset established titles.[10] Our reports are replete with reaffirmations that questions affecting titles to land, once decided, should no longer be considered open. *Minnesota Co.* v. *National Co.*, 3 Wall. 332, 334 (1866); *United States* v. *Title Ins. Co.*, 265 U. S. 472, 486 (1924). Certainty of rights is particularly important with respect to water rights in the Western United States. The development of that area of the United States would not have been possible without adequate water supplies in an otherwise water-scarce part of the country. *Colorado River Water Conservation District* v. *United States*, 424 U. S. 800, 804 (1976). The doctrine of prior appropriation, the prevailing law in the Western States, is itself largely a product of the compelling need for certainty in the holding and use of water rights.[11]

Recalculating the amount of practicably irrigable acreage runs directly counter to the strong interest in finality in this case. A major purpose of this litigation, from its inception to the present day, has been to provide the necessary assurance to States of the Southwest and to various private interests, of the amount of water they can anticipate to receive from the Colorado River system. "In the arid parts of the West . . . claims to water for use on federal reservations inescapably

---

[10] See E. Kempf, Abraham Lincoln's Philosophy of Common Sense, Part 1, p. 346 (1965).

[11] Prior appropriation law serves western interests by encouraging the diversion of water for irrigating otherwise barren lands and for other productive uses, and by ensuring developers that they will continue to enjoy use of the water. "Appropriation law, developed in the arid West, is usually thought of as a system for water-short areas. Where there is not enough for everyone, the rule of priority insures that those who obtain rights will not have their water taken by others who start later." F. Trelease, Cases and Materials on Water Law 11 (3d ed. 1979).

vie with other public and private claims for the limited quantities to be found in the rivers and streams." *United States v. New Mexico*, 438 U. S. 696, 699 (1978). If there is no surplus of water in the Colorado River, an increase in federal reserved water rights will require a "gallon-for-gallon reduction in the amount of water available for water-needy state and private appropriators." *Id.*, at 705. As Special Master Tuttle recognized, "[n]ot a great deal of evidence is really needed to convince anyone that western states would rely upon water adjudications." Tuttle Report, at 46. Not only did the Metropolitan Water District in California and the Central Arizona Project predicate their plans on the basis of the 1964 allocations, but, due to the high priority of Indian water claims, an enlargement of the Tribes' allocation cannot help but exacerbate potential water shortage problems for these projects and their States.[12]

Article IX did not contemplate a departure from these fundamental principles so as to permit retrial of factual or legal issues that were fully and fairly litigated 20 years ago. The Article does not explicate the conditions under which changes in the decree are appropriate. Very little discussion surrounded the Article, which was included in Master Rifkind's

---

[12] The United States and the dissenting Justices contend that the States did not enjoy certainty of the extent of their water rights until quantification of non-Indian present perfected rights was accomplished in 1979. Of course, not everything was settled in 1964, but most important things were and one of them was the extent of irrigable acreage within the uncontested boundaries of the reservations. The presence of other uncertainties did not render the 1964 decree an interlocutory judgment subject to relitigation in all respects. Moreover, under the United States' line of argument, echoed by the dissent, no aspect of our 1964 decision could safely be relied upon due to the incomplete determination of present perfected rights. As already noted, res judicata does not require all aspects of a case to be final before finality attaches. See n. 7, *supra.* We agree with the States that the uncertainties not resolved until 1979 were not of a nature and magnitude to deter the States from relying upon our 1964 decree with respect to the litigated issue of irrigable acreage on the reservations.

recommended decree as an agreed-upon provision.[13]   This in itself suggests that the Article was mainly a safety net added to retain jurisdiction and to ensure that we had not, by virtue of res judicata, precluded ourselves from adjusting the decree in light of unforeseeable changes in circumstances.

This reading is supported by the proceedings before Master Rifkind.   The record demonstrates that it was the understanding of the parties and Master Rifkind's intention that the calculation of practicably irrigable acreage be final.[14]

---

[13] Rifkind Report, at 360.   The Imperial Irrigation District was the only party expressly to address Article IX, noting that the Article would preserve the Court's power to correct determinations that are "erroneous or unworkable."   Supplement and Amendment to Imperial Irrigation District's Form of Decree of Court 11 (Dec. 1963).   The District's favoring the inclusion of Article IX may have been predicated on the States' more general argument for equitable apportionment, under which an open-ended decree could permit adjustments as increases in non-Indian water needs outstripped Indian water utilization.   We do not read the District's submission as recommending the relitigation of settled issues nor do we attach particular weight to the source as an indicium of the Court's intent in including Article IX.

[14] Master Rifkind's intention that the calculation of irrigable acreage be final is most clearly evident in one exchange with United States counsel on the precise subject.   Upon being informed that some mesa lands not included within the Government's submission might be irrigable if an additional pumping plant were constructed, Master Rifkind inquired whether the Government's maps "illustrate and define" the irrigable acreage. Mr. Warner, representing the United States, stated that he was probably not "authorized to give anything away that we ought to claim," but could offer assurance that "we do not propose to ask a decree allowing water . . . for use on the Indian reservations in excess of the proof we are now offering in this matter."   Master Rifkind then inquired: "And although there may be other irrigable lands within those reservations, those you do not lay any claim for the service of water upon?"   Mr. Warner replied: "That is correct," and Master Rifkind noted: "that is the way we are going to be bound.   This is a statement that I will take seriously."   Counsel then responded that if there was a mistake in the Indian water rights claims, the United States would "ask [for] leave to correct it."   This suggestion was clearly rebuffed by the Master, who labeled the categories of irrigable lands indicated on the maps as constituting a "Bill of Particulars," sub-

That was our understanding as well, and was reflected in his and our choice of the practicably-irrigable-acreage standard as a measure which would allow a *fixed* present determination of future needs for water.[15] It is untenable that the parties, the Special Master, and this Court would have intended Article IX to undercut the prevailing understanding that the calculation of practicably irrigable acreage was to be final without so much as discussing the subject.

This interpretation of Article IX is consistent with our action in prior original cases. Our long history of resolving disputes over boundaries and water rights reveals a simple fact: This Court does not reopen an adjudication in an original action to reconsider whether initial factual determinations were

---

ject to correction only for clerical error. Tr. of Arg. before Special Master Rifkind 14,154–14,157. The dissent, *post*, at 649, in seizing upon Mr. Warner's statement that he was not "authorized to give anything away," forgets that our interest in the exchange is that it reflects Master Rifkind's intent that the parties be bound by the submission on irrigable acreage.

Additional passages of similar import are collected in Appendix A to Brief for State Parties in Support of Exceptions (May 20, 1982). See also n. 15, *infra*.

[15] Master Rifkind's discussion of the disadvantages of an open-end decree make this clear:

"One possibility would be to adopt an open-end decree, simply stating that each Reservation may divert at any particular time all the water reasonably necessary for its agricultural and related uses as against those who appropriated water subsequent to its establishment. However, such a limitless claim would place all junior water rights in jeopardy of the uncertain and the unknowable. Financing of irrigation projects would be severely hampered if investors were faced with the possibility that expanding needs on an Indian Reservation might result in a reduction of the project's water supply." Rifkind Report, at 263–264.

For this reason, the Master concluded that "the most feasible decree" would be to establish a water right for each of the reservations in the amount necessary to irrigate all of the practicably irrigable acreage on the reservations and to satisfy related stock and domestic uses. This would "establish water rights of fixed magnitude and priority so as to provide certainty for both the United States and non-Indian users." *Id.*, at 265.

correctly made. In two original cases in which provisions virtually identical to Article IX were included, subsequent modifications were made in reaction to changed circumstances. *Wisconsin* v. *Illinois*, 278 U. S. 367 (1929), 281 U. S. 179, decree entered, 281 U. S. 696 (1930), temporarily modified, 352 U. S. 945 (1956), 352 U. S. 983 (1957), superseded, 388 U. S. 426 (1967); *New Jersey* v. *New York*, 283 U. S. 336, decree entered, 283 U. S. 805 (1931), modified, 347 U. S. 995 (1954).[16] The Court's purpose in retaining jurisdiction in those cases can be gleaned from the respective reports of the Special Masters, which note the need for flexibility in light of changed conditions and questions which could not be disposed of at the time of an initial decree.[17] This interpretation is also consistent with the role of a "court of equity to modify an injunction in adaptation to changed

---

[16] *Wisconsin* v. *Illinois* was an action brought to prevent Illinois and the Sanitary District of Chicago from diverting water from Lake Michigan for the purpose of diluting and carrying away the sewage of Chicago. The Court's decree was temporarily modified in 1956 because of an "emergency in navigation caused by low water in the Mississippi River." 352 U. S. 945. In *New Jersey* v. *New York*, litigation concerning the diversion of water from the Delaware River system, the decree was amended with the consent of the parties to take account of changed conditions concerning the discharge of sewage.

In *Wyoming* v. *Colorado*, 259 U. S. 419 (1922), the Court corrected an inadvertent omission four months after the entry of a decree. 260 U. S. 1 (1922). See 2 R. Clark, Waters and Water Rights 338 (1967).

[17] See Report of Special Master on Re-Reference in *Wisconsin* v. *Illinois*, O. T. 1929, Nos. 7, 11, and 12, Orig., p. 145 ("It is recommended that the Court should retain jurisdiction as there are questions which it is impossible to dispose of at this time in full justice to the parties . . . and unforeseen contingencies may arise"); Report of Special Master in *New Jersey* v. *New York*, O. T. 1930, No. 16, Orig., p. 199 (recommending retention of jurisdiction because "the future is necessarily fraught with uncertainties"). See also Report of Special Master in *Nebraska* v. *Wyoming*, O. T. 1944, No. 6, Orig., p. 10 ("Recommendation is further made of retention by the Court of jurisdiction to amend the decree upon a showing of such change of conditions as might render the operation of the decree inequitable").

conditions." *Railway Employes* v. *Wright*, 364 U. S. 642, 647 (1961); *United States* v. *Swift & Co.*, 286 U. S. 106, 114 (1932).

We note that our cases with similar reservations of jurisdiction involved equitable apportionment where our latitude to correct inequitable allocations injustices is at its broadest. If even there our retention of jurisdiction was limited to the consideration of new issues and changed circumstances, rather than to permit the relitigation of factual determinations on which a decree has been based, *a fortiori* the reservation of jurisdiction in this case, not governed by equitable apportionment, is no broader.[18]

We also fear that the urge to relitigate, once loosed, will not be easily cabined. The States have already indicated, if the issue were reopened, that the irrigable-acreage standard itself should be reconsidered in light of our decisions in *United States* v. *New Mexico*, 438 U. S. 696 (1978), and *Washington* v. *Washington Commercial Passenger Fishing Vessel Assn.*, 443 U. S. 658 (1979), and we are not persuaded that a defensible line can be drawn between the reasons for reopening this litigation advanced by the Tribes and the United States on the one hand and the States on the other. It would be counter to the interests of all parties to this case to open what may become a Pandora's Box, upsetting the certainty of all aspects of the decree. These considerations, combined with the practice in our original cases and the

---

[18] It is not seriously contended that the claim for omitted lands is predicated upon an unforeseeable change in circumstances. The only suggested pertinent development since the prior adjudication is the advent of more sophisticated irrigation technologies that would increase the amount of practicably irrigable acreage. Clearly, however, such technological improvements will continue indefinitely, and if a basis for recalculating the extent of irrigable acreage, the decree would have no finality at all. The United States concedes that "technological advances alone ought not to call for re-opening a complete decree," Reply Brief for United States 18. We agree.

strong res judicata interests involved, lead us to conclude that the irrigable-acreage question should not be relitigated.

Because we have determined that the principles of res judicata advise against reopening the calculation of the amount of practicably irrigable acreage, and that Article IX does not demand that we do so, it is unnecessary to resolve the bitterly contested question of the extent to which the States have detrimentally relied on the 1964 decree. Detrimental reliance is certainly relevant in a balancing of the equities when determining whether changed circumstances justify modification of a decree. We believe that a certain manner of reliance has occurred, *supra*, at 621, but even the absence of detrimental reliance cannot open an otherwise final determination of a fully litigated issue. Finality principles would become meaningless if an adversarially determined issue were final only if the equities were against revising it.[19]

Similarly, it is hardly determinative that the changes requested by the United States and the Indian Tribes do not involve reallocations of as much water as was involved in the initial litigation. Aside from the fact that the requested increases of between 15 and 22 percent in the amount of irrigable acreage determined in the initial decree hardly constitute "relatively minor adjustments," the magnitude of the adjustment requested is relevant only *after* it is established that the underlying legal issue is one which should be redetermined.

Finally, the absence of the Indian Tribes in the prior proceedings in this case does not dictate or authorize relitigation of their reserved rights. As a fiduciary, the United States had full authority to bring the *Winters* rights claims for the

---

[19] We are not convinced of the dissent's assessment that "the balance of hardships in this case is decidedly in the Tribes' favor." *Post*, at 655. As the dissent recognizes, "the Tribes are not currently able to use all the rights allocated to them under the 1964 decree," *post*, at 653. When viewed against the serious water shortages faced by all people, including other Tribes, in the Lower-Basin States, this is hardly the mark of manifest injustice.

Indians and bind them in the litigation. *Heckman* v. *United States*, 224 U. S. 413 (1912).[20] We find no merit in the Tribes' contention that the United States' representation of their interests was inadequate whether because of a claimed conflict of interests arising from the Government's interest in securing water rights for other federal property, or otherwise. The United States often represents varied interests in litigation involving water rights, particularly given the large extent and variety of federal land holdings in the West. See, *e. g.*, *Colorado River Water Conservation District* v. *United States*, 424 U. S., at 805. The Government's representation of these varied interests does not deprive our decisions of finality. In this case, there is no demonstration that the United States, as a fiduciary, was involved in an actual conflict of interest. From the initiation of this case, the Government has taken seriously its responsibility to represent the Tribes' interests, and we have no indication that the Government's representation of the Tribes' interests with respect to the amount of practicably irrigable acreage was legally inadequate. Recognition of Indian water rights would not di-

---

[20] Contrary to the dissent, *post*, at 650, *Heckman*'s square holding that the United States' representation of Indian claims is binding, 224 U. S., at 443–446, has not been undermined, let alone "repudiated," by subsequent cases. *Cramer* v. *United States*, 261 U. S. 219 (1923), was a suit brought by the United States to confirm the right of several individual Indians to possess certain lands patented to a third party. A bare citation, *id.*, at 232, is the extent of *Heckman*'s role in the case. *Shoshone Tribe* v. *United States*, 299 U. S. 476 (1937), and *United States* v. *Creek Nation*, 295 U. S. 103 (1935), the other cases relied upon by the dissent, involve suits brought in the Court of Claims by Indian Tribes seeking compensation from the United States for alleged takings of Indian lands. Neither of these cases even mentions, let alone qualifies, *Heckman*. Nor does either case involve the Government's binding of Indian interests in court. If these cases are at all relevant, it is to suggest that in an appropriate case the Tribes' remedy for inadequate representation by the Government may lie in the Court of Claims. We, of course, do not intimate any view now as to whether such remedy is available.

minish other federally reserved water rights.[21]    Under the
Project Act, there was no basis for the Government to be-
lieve that Indian water rights and water needs for other *fed-
eral* property were in direct competition.    Our 1963 opinion
bore this out: perfected rights for the use of federal establish-
ments were charged against the States' apportionment, 373
U. S., at 601, and, in times of shortage, under the decree, the
Secretary of the Interior retained broad power to ensure that
perfected rights for the use of federal establishments are sat-
isfied.    *Id.*, at 593–594; 376 U. S., at 343–344.    Indeed, the
substantial water allocations awarded the Tribes reflect the
competency of the United States' representation.    We be-
lieve the issue of practicably irrigable acreage was fully and
fairly litigated in 1963.

Accordingly, we sustain the States' exceptions to this as-
pect of the Special Master's report.

## V

We now address the dispute over reservation boundaries,
which first arose during the hearing before Special Master
Rifkind.

## A

In the course of the proof by the United States as to the
extent of the irrigable acreage of the Colorado River and
Fort Mojave Reservations, California disputed the location of

---

[21] A breach of the United States' duty to represent the Tribes' interests is
not demonstrated merely by showing that the Government erred in its cal-
culation of irrigable acreage, whether by oversight or, as viewed in retro-
spect, by an unnecessarily cautious litigation strategy.    Certainly, a claim
of inadequate representation is not found—at least not in a court of law—
by sifting through testimony in Congress, Presidential speeches, and other
commentary which discuss whether the Government has at other times in
other circumstances been "slow to press Indian claims."    The dissent's
reliance on such sources, *post*, at 650–652, only highlights that a claim of
inadequate representation cannot be supported on this record.    Indeed,
the dissent concedes that the United States has not violated ordinary
standards of attorney care as to be liable for inadequate representation.

the boundaries of these reservations. On the theory that failure to adjudicate these controversies would leave non-Indian users in doubt as to the water available for their use, and would leave the Secretary in doubt as to how to operate Hoover Dam and the mainstream works below, the former Master deemed it necessary to resolve the boundary disputes, see Rifkind Report, at 256–257, and he held several days of hearings on these matters. Tr. 19,992 *et seq.* California objected to these proceedings. The State felt it lacked authority to represent the private individuals who claimed title to land the United States contended was part of the reservations. *Id.*, at 19,998–20,000. The Master nevertheless ruled on the boundary issues, for the most part in California's favor—that is, the Master concluded that the reservations covered a smaller area than the United States claimed and that the irrigable acreage and reserved water rights should be determined on this basis.

California maintained its position before this Court that the Master should not have determined the disputed boundary of the Colorado River Reservation. California contended that it would be unfair to prejudice any of the parties in future litigation over land titles or political jurisdiction by approving findings on a tangential issue never pleaded by the United States. The State also observed that postponing determination of the boundary dispute would not materially affect the priority of the water right to which the disputed land was entitled, since both the Indians and the Palo Verde Irrigation District, in which California would place the disputed land, had high priorities.[22] California did not specifically object to the Master's resolution of the Fort Mojave boundary dispute, no doubt because, on the merits of this issue, the Master entirely agreed with the State's position.

The United States responded that the Master acted properly by resolving the boundary disputes:

---

[22] Opening Brief of California Defendants in Support of Their Exceptions 279–283 (May 22, 1961).

"The determination of the boundary of each Reservation is an essential prerequisite to the determination of the quantum of the water rights for that Reservation. There is no question of the Court's jurisdiction to resolve boundary questions nor of the authority of California to act as *parens patriae* for its citizens in such matters." [23]

The United States did not file any exceptions to the boundary determinations of the Special Master.

We did not accept the Master's resolution of the boundary disputes:

"We disagree with the Master's decision to determine the disputed boundaries of the Colorado River Indian Reservation and the Fort Mohave Indian Reservation. We hold that it is unnecessary to resolve those disputes here. Should a dispute over title arise because of some future refusal by the Secretary to deliver water to either area, the dispute can be settled at that time." 373 U. S., at 601.

The decree that we entered limited the water rights of the two reservations to those awarded by the Master, based on the irrigable acreage within the boundaries as he had found them, but with respect to the boundary disputes, as stipulated by the parties,[24] Article II(D)(5) of the decree provided:

"[T]he quantities [of water] fixed in [the paragraphs setting the water rights of the Colorado River and Fort Mojave Reservations] shall be subject to appropriate adjustment by agreement or decree of this Court in the event that the boundaries of the respective reservations are finally determined." 376 U. S., at 345.

B

The disputes about the boundaries of the Colorado River and the Fort Mojave Reservations are still with us. And

---

[23] Answering Brief of United States 95 (Aug. 16, 1961).

[24] Agreed Provisions for Final Decree 10 (Dec. 18, 1963).

since the time our original decree was entered in 1964, disputes about the boundaries of the other three reservations have emerged. It is thus necessary to decide whether any or all of these boundary disputes have been "finally determined" within the meaning of Article II(D)(5), and, if so, whether the Tribes are entitled to an upward adjustment of their water rights. We begin with a summary of each of the boundary issues.

We describe first the Colorado River Reservation boundary dispute. Master Rifkind agreed with California that the disputed portion of the western boundary of the reservation ran along the west bank of the Colorado River as it moved from time to time, subject to the ordinary rules of accretion, erosion, and avulsion. The Master rejected the United States' claim that the boundary was fixed at the point where the west bank of the river existed on May 15, 1876, the date of the relevant Executive Order revising the boundaries of the reservation. Because we found it unnecessary to resolve the question, this dispute remained open for later settlement.

On January 17, 1969, the Secretary of the Interior, relying on an opinion of the Department's Solicitor, issued an order directing that approximately the northerly two-thirds of the disputed boundary was to follow the meander lines of 1879 and 1874 and was not to follow the changing west bank of the Colorado River. This order, issued unilaterally and without a hearing, added some 4,400 acres to the reservation. Later, the United States, on behalf of the Tribes, obtained final judgment in title disputes with private parties quieting title in the Tribes to various parcels in the area added to the reservation. Also, in the course of establishing the western boundary, the Secretary corrected what he deemed to be an error in an old survey. He approved the corrected plat adding 450 acres to the reservation on December 18, 1978.

Second is the dispute as to the boundary of the Fort Mojave Reservation, specifically, the location of the westerly boundary of the so-called Hay and Wood Reserve portion of

the reservation. Special Master Rifkind found that the area had been officially surveyed in 1928 and that the survey, adopted by the General Land Office of the Interior Department in 1931, was binding on the United States. Water rights were accordingly awarded on this basis. On June 3, 1974, however, the Secretary of the Interior, by order, declared null and void the 1928 survey relied upon by the Special Master and directed that a new survey be made so as to reflect the total acreage recited in the description of the Hay and Wood Reserve when it was added to the reservation in 1890. A new survey was accordingly prepared, the final plat being approved on November 6, 1978. This plat added to the reservation some 3,500 acres not treated as part of the Fort Mojave Reservation when water allocations were decreed in 1964. In this litigation, the United States claims that this additional tract contains approximately 2,000 irrigable acres for which water should be provided on a priority basis.

Third, a post-1964 secretarial order substantially enlarging the Fort Yuma Reservation has engendered controversy. The question that arose was whether some 25,000 acres of land, which in earlier proceedings in this case were not claimed by the United States to be part of the Fort Yuma Reservation, should now be deemed part of the reservation, thereby entitling the Tribe to appropriate additional water rights. A 1936 Interior Department Solicitor's opinion, based on an 1893 agreement with the Fort Yuma Tribes, had ruled that these lands were not part of the reservation. 1 Op. Solicitor of Dept. of Interior Relating to Indian Affairs 1917–1974, p. 596. In 1968 and 1977, Interior Department Solicitors reaffirmed the 1936 opinion. But on December 20, 1978, with no prior notice to parties who had participated in proceedings leading to the 1977 opinion, the Solicitor of the Interior Department overruled the three earlier Solicitor opinions and concluded that the 1893 agreement was invalid. 86 I. D. 3 (1978). The Secretary acted on that opinion,

thereby adding 25,000 acres to the reservation. The next day, the United States filed a claim in this proceeding asserting that some 5,800 acres of this area were irrigable. The Tribes claimed that even more of this tract was irrigable.

The Chemeheuvi Indian Reservation boundaries have also been changed since 1964. Some 2,430 acres were "restored" to this reservation by secretarial order of August 15, 1974. This resulted from a secretarial determination that part of the land taken from the reservation for the construction of Parker Dam was not needed. However, neither the United States nor the Tribe claimed before the Special Master that there is any irrigable acreage within this addition.

There have been still other boundary developments in the years since our first decree in this case. In 1977, the Fort Mojave Tribe obtained a stipulated judgment in its favor against the assignees of a railroad patent grant. Nearly a section of land was thereby added to the reservation, 500 acres of which, it is claimed, are irrigable. Also, since 1964, there has been an accretion of some 883 acres along the west boundary of the Cocopah Indian Reservation, an accretion that the United States asserts has been confirmed as part of the reservation by a final court decree entered on May 12, 1975. Finally, in § 102(e) of the Colorado River Basin Salinity Control Act, Pub. L. 93–320 (June 24, 1974), 88 Stat. 269, Congress directed the Secretary to cede a tract of federal land to the Cocopah Indians as an addition to their reservation. This cession was intended to be considered full payment for a certain right-of-way across the Cocopah Reservation. See S. Rep. No. 93–906 (1974). Between the accretion and the congressional Act, the United States claims that 1,161 irrigable acres have been added to the Cocopah Reservation.

As we have recited, *supra*, at 630–632 and this page, all of the foregoing developments with respect to reservation boundaries took place long prior to the entry of our supplemental decree in 1979. We were apprised of them by the

motions of the Tribes to intervene and by the motion of the United States filed in 1978 to amend the decree by awarding additional water, based on what were alleged to be final determinations enlarging the reservation boundaries and the irrigable acreage therein. Our supplemental decree of 1979 did not rule on these motions or resolve these disputes. Rather, it not only expressly left unaffected Article II(D)(5) providing for possible adjustments with respect to the Colorado River and Fort Mojave Reservations, but it also left open the issues about the boundaries of the other reservations:

> "[T]he quantities [of water] fixed in [the 1964 decree sections setting forth the water rights of each of the five Tribes] shall continue to be subject to appropriate adjustment by agreement or decree of this Court in the event that the boundaries of the respective reservations are finally determined." 439 U. S., at 421.

The motions of the United States and the Tribes were referred to the Special Master. *Id.*, at 436–437.

## C

In its motion to amend the decree, the United States, with the support of the five Tribes, contended that the above-described events constituted "final determinations" of the boundaries within the meaning of our 1964 decree. The state parties and the California agencies objected that the secretarial orders and the quiet title judgments were not "final determinations" within the meaning of Article II(D)(5) of our decree, since they had not been given an opportunity to participate in any of these proceedings, and since the administrative orders were still susceptible to judicial review. They argued, however, that the boundary controversies were ripe for judicial review, and they urged the Special Master to receive evidence, hear legal arguments, and resolve each of the boundary disputes, but only for the limited purpose of establishing additional Indian water rights, if any.

Observing that we had rebuffed the former Master's attempt to resolve these disputes, Special Master Tuttle rejected the contention that he should make a *de novo* determination of the boundaries. While recognizing that the secretarial orders might be set aside in an appropriate judicial forum, and that the court judgments, although "accepted" by the Secretary, were not res judicata as to the state parties or the California agencies, the Master nevertheless found that these acts "provide[d] the sort of finality contemplated by the Court when it left the boundary disputes concerning the Reservations for later determination." Tuttle Report, at 64. He regarded the two boundary disputes before the Court in 1963 as involving "conflicting positions within the Interior Department or ambiguities in the description of boundaries." Had the recent "definitive" secretarial orders, which have "swe[pt] aside inconsistencies and ambiguities," existed at the time of the hearing before the prior Master, they "would have removed any choice that the prior Master may have had regarding the proper boundaries," because boundaries fixed by Interior Department surveys are "conclusive in collateral proceedings." *Id.*, at 67–69 (citing *Borax Consolidated, Ltd.* v. *Los Angeles*, 296 U. S. 10, 16–17 (1935); *Stoneroad* v. *Stoneroad*, 158 U. S. 240, 250–252 (1895); *Knight* v. *United States Land Assn.*, 142 U. S. 161, 176–187 (1891); *Cragin* v. *Powell*, 128 U. S. 691, 698–699 (1888)).

The Master was unmoved by the state parties' argument that they did not receive their "day in court" before any administrative or judicial decisionmaker, since he was "aware of no claim to land in any of the disputed areas by any of the State Parties." Tuttle Report, at 74. Any remaining concerns could "be met by the inclusion in the final decree of the Court of a provision that would reduce the allotment now sought on behalf of the Tribes *pro tanto* for lands found to be practicably irrigable which subsequent litigation determines not to be Indian land." *Id.*, at 75. Accordingly, the Master

accepted almost all of the boundary changes set forth in the motion of the United States, and the States and the agencies filed their exceptions.

## D

We cannot agree with the Special Master that the reservation boundaries extended by secretarial order have been "finally determined" within the meaning of Article II(D)(5) of our 1964 decree. With respect to these boundary lines, we sustain the exceptions and decline to increase the Tribes' water rights at this time.[25] However, with respect to the boundaries determined by judicial decree,[26] we overrule the exceptions and adopt the Master's conclusions.

In our 1963 opinion, when we set aside Master Rifkind's boundary determinations as unnecessary and referred to possible future final settlement, we in no way intended that *ex parte* secretarial determinations of the boundary issues would constitute "final determinations" that could adversely affect the States, their agencies, or private water users holding priority rights. In the first place, Article II(D)(5) was a stipulated provision; it is implausible to suggest that the

---

[25] It follows *a fortiori* from this conclusion that we must overrule the United States' claim that administrative action subsequent to the date the Master filed his report has "finally determined" the boundaries of another disputed tract—the so-called "Checkerboard area"—alleged to be part of the Fort Mojave Reservation. See Tuttle Report, at 81–83.

[26] These include: (1) the boundary fixed by the 1977 judgment in favor of the Fort Mojave Tribe against the assignees of the railroad patent grant; and (2) the boundary determined by the court decree of May 12, 1975, which confirmed certain accreted land to be part of the Cocopah Reservation. See *supra*, at 633. The only other court judgments relevant to this case are those obtained by the United States on behalf of the Colorado River Tribes. These judgments quieted the Tribes' title to certain parcels of land *totally within* the area added to the reservation by the secretarial order of January 17, 1969. See *supra*, at 631. Accordingly, in view of our holding that the secretarial orders do not constitute "final determinations," the Colorado River Tribes will have to await the results of further litigation before they can receive an increase in their water allotment based on the land determined to be part of the reservation by these latter judgments.

States would have so meekly stipulated to *ex parte* secretarial determinations beyond the reach of judicial review. Furthermore, it was the United States that insisted that Master Rifkind should adjudicate the boundary disputes. The Special Master complied, and the United States filed no objections to his conclusions. Indeed, all of the parties treated the boundary matters as fully adjudicable issues of material fact or law. The United States wanted those matters to be adjudicated here; California apparently wanted them resolved elsewhere. But no one contended that they should not be judicially resolved at all. Present and former officials of the Department of the Interior testified and cooperated fully with the United States at the hearing before Master Rifkind. The Department's views appeared to be as definitive and final as they ever would be. No one suggested that future administrative determinations were being contemplated, or that any such future proceedings would purport conclusively to determine the issue then before the Court.

Of course, we now intimate nothing as to the Secretary's power or authority to take the actions that he did or as to the soundness of his determinations on the merits. It must be remembered that while we did not accept Master Rifkind's boundary decisions, water allocations to the Tribes under our decree were limited to the irrigable lands within the reservation boundaries as the Master had determined them to be. Thus, up to the present the States have had the benefit of their victory before Master Rifkind on the boundary issues; and even if there were something they might have done to set in motion some judicial proceeding to resolve the disputes left open by our decree, they obviously had no great incentive to do so. The United States, on the other hand, the intervenor with the burden of proving reserved rights, might have instituted appropriate judicial proceedings in the District Courts, in which event the issues tried by the Special Master would presumably have been relitigated. Instead, the Secretary

chose to bring matters to a head by a series of secretarial orders, culminating with the 1978 motion in this Court moving for a determination of the irrigable acreage within the boundary lands recognized by the Secretary, and for appropriate additional water allocations.

While the California agencies have filed suit to set aside the secretarial orders extending reservation boundaries, the States have not yet sought to intervene in that litigation. They, along with the state agencies themselves, insist that Special Master Tuttle erred in refusing to adjudicate the boundary issues, that their exceptions in this respect should be sustained, and that appropriate action should be taken to resolve the disputes in this original action. In this respect, we disagree with the States. It is clear enough to us, and it should have been clear enough to others, that our 1963 opinion and 1964 decree anticipated that, if at all possible, the boundary disputes would be settled in other forums. At this juncture, we are unconvinced that the United States District Court for the Southern District of California, in which the challenge to the Secretary's actions has been filed, is not an available and suitable forum to settle these disputes. We note that the United States has moved to dismiss the action filed by the agencies based on lack of standing, the absence of indispensable parties, sovereign immunity, and the applicable statute of limitations.[27] There will be time enough, if any of these grounds for dismissal are sustained and not overturned on appellate review, to determine whether the boundary issues foreclosed by such action are nevertheless open for litigation in this Court. If the litigation goes forward and is concluded, there will then also be time enough to determine the impact of the judgment on our outstanding decree with respect to Indian reservation water rights.[28]

---

[27] The District Court in the agencies' suit has stayed further proceedings pending this Court's decision in the present case. *Metropolitan Water District* v. *United States*, Civ. No. 81–0678–GT(M) (Apr. 28, 1982).

[28] The dissent, *post*, at 655, ascertains "no discernible purpose" in our refusal to award the Tribes an immediate increase in their water rights in the

Hence, in our judgment, the litigation filed in the United States District Court for the Southern District of California should go forward, intervention motions, if any are to be made, should be promptly made, and the litigation expeditiously adjudicated. If there are issues in that action without substantial connection to the issues in this original action, they should be severed and adjudicated separately if their consideration would substantially delay the final resolution of the questions which have made it necessary to keep our decree in this action open to accommodate the results of unresolved issues.[29]

---

areas determined to be part of the reservations by the *ex parte* secretarial orders. The dissent agrees with the Special Master that the Tribes should now be given an increase, qualified by the proviso that these rights will be reduced *pro tanto* for practicably irrigable acreage in an area which subsequent litigation determines not to be Indian land. Unless it is assumed that any challenges to the Secretary's determinations are bound to fail, the dissent's approach has little to commend it in terms of judicial economy or finality. Its, as well as our, resolution anticipates further litigation that may affect the terms of our decree. Moreover, it would require us to decide now, perhaps unnecessarily, the propriety of the Master's findings on irrigable acreage. The dissent's reasoning would also deprive the States, albeit on a "conditional basis," *post*, at 656, of valuable water rights now vested in them, without affording them the slightest semblance of a fair hearing on their claims. Cf. *Fuentes* v. *Shevin*, 407 U. S. 67 (1972) (invalidating a procedure allowing prejudgment taking of property without notice or hearing). The dissent identifies no plausible basis for its conclusion that an *ex parte* determination by an executive officer of a party to this litigation should constitute a "final determination" within the meaning of our decree.

The dissent also observes, *post*, at 657–658, n. 10, that, under our holding, the States have no real incentive to bring the pending litigation to a prompt conclusion. If his approach were adopted, however, the United States and the Tribes would similarly lack incentive. At present, we have no reason to believe that the District Court will fail to ensure that the pending litigation will be promptly concluded.

[29] If the States and/or the agencies wish to challenge the recently finalized administrative action regarding the "Checkerboard area," see n. 25, *supra*, they should amend their complaint and raise the issue in the District Court suit.

As for the several judicial adjudications of boundary disputes that determined certain lands to be Indian lands, very little need be said. The Special Master observed, and the States proclaim, that the States were not parties to these adjudications and are not bound by them in a res judicata sense. This is correct, but neither the States nor the California agencies, in their exceptions or briefs, have asserted that any of the decrees mistakenly determined that the parcels of land at issue in the adjudications were reservation lands. To the contrary, the States' brief in support of their exceptions declares that "[w]e do not seek to challenge title determined in any of the cases relied upon by the United States." Exceptions of State of Arizona et al. 64.

This being so, these adjudications are final as a practical matter, and the only issue remaining concerning these parcels, which the States concede are Indian land, is the same issue that would remain if the Special Master had made the same boundary determinations and the States were content to accept them—namely, how much practicably irrigable acreage exists in each such parcel? That issue Special Master Tuttle determined as to each parcel involved in this litigation. Insofar as we can discern from the States' brief, *id.*, at 117, Table 1, the States do not differ with the Master's determination of irrigable acreage in the areas added to the reservations by way of judicial decree, except perhaps to the extent of a few acres in the tract labeled FM–11 by the parties.[30] The States argued to the Master that a small portion of FM–11 is too sandy to be irrigable. The Master, however,

---

[30] Seventeen acres of FM–11 were determined to be part of the Fort Mojave Reservation by the judgment in *Fort Mojave Tribe* v. *La Follette*, Civ. No. 69–324MR (Ariz., Feb. 7, 1977). See Supplemental Memorandum for United States with Respect to Its First Exception 5 (Sept. 27, 1982). The remainder of FM–11 has not been added to the reservation by judicial decree; it is part of the "Checkerboard area." See *id.*, at 3; n. 25, *supra.* The States claim that 24 acres of FM–11 are too sandy to be practicably irrigable, but it appears that few, if any, of these 24 acres are within the part of FM–11 awarded to the Tribe in the *La Follette* decree. See State Parties' Exhibits 142, 158(G).

recited evidence that there is no sandy land in the FM–11 tract, and the States suggest no basis for rejecting the Master's determination that this land is practicably irrigable.[31]

Therefore, we conclude that the decree should be amended by providing to the respective reservations appropriate water rights to service the irrigable acreage the Master found to be contained within the tracts adjudicated by court decree to be reservation lands.

There is no issue about the expansion of the Cocopah Reservation by congressional statute. The water right for that addition to the reservation could not be given and was not given a retroactive priority date. The right accorded dates from June 24, 1974, and hence will not disturb the prior rights of the States or the other parties to this case.

## VI

Because of our disposition of the above issues, it is not necessary to resolve the other exceptions brought by the States and state agencies pertaining to the amount of irrigable acreage within the so-called omitted lands or within the boundaries that we have not recognized as finally determined at this time. It is similarly unnecessary for us to pass on the exceptions brought by the United States concerning the recommended decree. The parties are directed to submit, before September 19, 1983, a proposed decree to carry this opinion into effect.

*It is so ordered.*

---

[31] At the hearing before Master Tuttle, the States presented the expert testimony of economists who stated that sandy acreage could not practicably be farmed because crop yields would be too low and production costs too high. The States have excepted to the Master's rejection of this *economic* testimony. However, the Master accepted the testimony of the United States' *soils* expert, who concluded that no sandy lands existed on FM–11. Tuttle Report, at 188–189. The States have not contested the Master's finding that the soil on FM–11 is not sandy, and this ends the matter. It is thus unnecessary for us to consider the States' arguments regarding the economic feasibility of farming on sandy soil.

JUSTICE MARSHALL took no part in the consideration or decision of this case.

JUSTICE BRENNAN, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join, concurring in part and dissenting in part.

I join Part III of the Court's opinion, granting the petitions to intervene in this action filed by the Fort Mojave, Colorado River, Chemehuevi, Cocopah, and Quechan Tribes (collectively, the Tribes). I also agree with the basic premise of Part IV of the Court's opinion that in Article IX of our 1964 decree, 376 U. S. 340, 353, we retained the power to reconsider our quantification of the Tribes' reserved water rights, as set out in Article II(D) of the 1964 decree, id., at 343–345. See ante, at 618. I part company with the Court, however, in its refusal to exercise that power, given the unique circumstances of this litigation and the timing of the Tribes' and United States' motions. In addition, I find inexplicable the Court's decision to sustain the exceptions of Arizona, California, and the California agencies (hereinafter States) to the Special Master's proposed solution to the boundary lands controversy.

I

The so-called "omitted" lands are irrigable areas, within the Tribes' reservations, which the United States failed to identify during the extensive proceedings before Special Master Rifkind that preceded our 1964 decree. The fact that irrigable lands were not called to the attention of the Master or the Court is significant because the Master and the Court held that the amount of water which the Tribes were entitled to divert from the mainstream of the Colorado depended on the number of "irrigable acres" within each reservation. 373 U. S. 546, 601 (1963); Report of Special Master Rifkind 263–265 (hereinafter Rifkind Report). Although the States vociferously dispute exactly how much of the omitted lands

are in fact irrigable, they do not dispute two facts critical to the question now before the Court. First, even under the States' legal theories a substantial portion of the omitted lands are irrigable—at least 18,500 acres, see Report of Special Master Tuttle 109, 125 (hereinafter Tuttle Report)—and would have supported an award of additional diversion rights in our 1964 decree had they been identified at that time. Second, the United States completely failed to present evidence regarding the irrigability of these lands until after the Tribes sought leave to intervene in these proceedings in 1977.

There are strong arguments for correcting the quantifications of the Tribes' diversion rights in the 1964 decree, to include the amounts of water that could be used economically to irrigate the omitted lands. As this litigation now stands, the considerations of finality are not so strong, nor the interests of justice so weak, as the Court would have them. The system contemplated by our 1964 decree for allocating the waters of the Colorado River's Lower Basin has yet to become final, either as a formal or as a practical matter, and correction of the decree at this time would in no way compromise our continuing intention to effect a final allocation of the Lower Basin mainstream. Furthermore, awarding additional diversion rights to reflect the irrigable acreage not considered prior to the 1964 decree would correct a manifest injustice to the Tribes, who were not themselves before this Court in 1964, and it would do so with little, if any, prejudice to interests of other parties to this litigation.

## A

The Court's opinion excessively extols the principle of "finality," but overlooks the caveat that "finality" means different things in different contexts, and that the law accords finality different weight depending on the context. First, the Court borrows support from formal, largely nondiscretionary doctrines such as res judicata. It admits, however, that res

judicata has no applicability to this case, *ante,* at 619, for the simple reason that the omitted lands claims have been raised in the course of the same proceeding in which they were supposedly decided before, and that proceeding has not yet reached the stage of final judgment. In a case such as this, when a party seeks reconsideration of questions decided at an earlier stage of a single, continuing litigation, the law allows courts more discretion than in a case in which the party wants to upset a final judgment in another proceeding, before another judge. See generally 1B J. Moore & T. Currier, Moore's Federal Practice ¶¶ 0.401, 0.404[1] (1982) (hereinafter Moore); cf. *United States* v. *United States Smelting Refining & Mining Co.,* 339 U. S. 186, 199 (1950).

A final judgment makes a difference. It marks a formal point at which considerations of economy, certainty, reliance, and comity take on more strength than they have before the judgment. A court's decision to reconsider a prior ruling before the case becomes final, however, is ultimately a matter of "good sense." Moore § 0.404[10], at 573. Concern for finality remains an important policy, even before final judgment. In the absence of some overriding reason, a court should be reluctant to reopen that which has been decided merely to correct an error, even though it has the power to do so. See *Messenger* v. *Anderson,* 225 U. S. 436, 444–445 (1912). Nevertheless, federal courts have traditionally thought that correcting a manifest injustice was reason enough to reconsider a prior ruling, see Moore ¶ 0.404[1], p. 408, and, although they may hold a party to its failure to litigate a claim when it had the opportunity, they have regarded finality concerns as less compelling when the question at issue has never actually been contested, see *Hartford Life Ins. Co.* v. *Blincoe,* 255 U. S. 129, 136 (1921).[1]

---

[1] The equity doctrine of "changed circumstances," see *ante,* at 624–625, reflects many of the same principles. Yet even if changed circumstances are necessary to modify an injunction—and I doubt that an equity court would turn its back on manifest injustice—they have never been the *sine*

The Court also uses "finality" in a more practical sense, appealing to the obvious benefits to society of having property rights be certain. This meaning of finality underlies the Court's invocation of Abraham Lincoln and the development needs of the West. *Ante*, at 620–621. More importantly, it was central to the Court's choice of an "irrigable acreage" standard in 1963, for that measure accorded the highest degree of certainty to all Lower Basin interests. Special Master Rifkind rejected Arizona's proposal that the Indians be allocated only enough water to satisfy their presently foreseeable needs, precisely because that solution would be subject to re-evaluation in the future, "plac[ing] all junior rights in jeopardy of the uncertain and the unknowable." Rifkind Report 263–264. Therefore, he urged—and the Court held, 373 U. S., at 600–601:

> "[T]he most feasible decree that could be adopted in this case, even accepting Arizona's contention, would be to establish a water right for each of the five Reservations in the amount of water necessary to irrigate all of the practicably irrigable acreage on the Reservation. . . . This will preserve the full extent of the water rights created by the United States and will establish rights of fixed magnitude and priority so as to provide certainty for both the United States and non-Indian users." Rifkind Report 265.

Thus, although the Court stresses Special Master Rifkind's interest in a fixed and final decree, see *ante*, at 622–624, and n. 15, that interest is largely irrelevant to the question at hand. One can share Special Master Rifkind's interest in having a fixed decree, and even Abraham Lincoln's scorn for scoundrels in courthouse basements, and still think it desirable to correct the decree before it becomes fixed. Our interest in a fixed, reliable decree is well enough served if we make clear

*qua non* of adjusting a decree in the process of making it final. The question before us is whether we should do that.

that it should not be subject to reopening, even to correct the kind of clear error that the Tribes and the United States have shown here, once this litigation becomes final.

The Court acknowledges that this litigation was far from final when the United States and the Tribes raised the claims now at issue, because the Court had not confirmed a list of the "present perfected rights," or rights to use Colorado River mainstream flows that vested before the effective date of the Boulder Canyon Project Act of 1928, 43 U. S. C. § 617. *Ante,* at 611. The allocation system for the Lower Basin could not become final until an authoritative list of "present perfected rights" and their priority dates had been established.[2] Article II of the 1964 decree identified a number of federal "present perfected rights," including those of the Tribes, representing rights to divert about 900,000 acre-feet of mainstream flows per year. The 1964 decree, however, did not address any "present perfected rights" acquired under state law. The full list of "present perfected rights" was not submitted to or confirmed by this Court until 1979. See 439 U. S. 419. As quantified by our 1979 decree, state "present perfected rights" accounted for rights to divert well over 3 million acre-feet of mainstream flows. Thus, in 1977,

---

[2] It is unnecessary to describe fully the complex structure of our 1964 decree. Suffice it to say that the Indian Tribes' rights at issue in this case are among the "present perfected rights," but they are not the only such rights. These rights are important because the Secretary of the Interior has an obligation to satisfy them to their full extent, and that water is charged against the States' overall entitlements under the 1964 decree. Furthermore, in drought years "present perfected rights" cannot be made to bear pro rata reductions along with other water users; rather, the Secretary is obligated to satisfy them in full, starting with the right established first in time and proceeding chronologically (except for the Indian rights, which must be satisfied first regardless of priority, 439 U. S. 419, 421 (1979)). As a practical matter, then, the more "present perfected rights" there are, the less certain it is that other users will receive a specific amount of water in any given year, especially in years when mainstream flows are less than the 7.5 million acre-feet benchmark used in the 1964 decree.

when the Tribes first sought to intervene in this litigation for the purpose of raising their omitted lands claims, and in 1978, when the United States moved for entry of a supplemental decree concerning the omitted lands, issues critical to the 1964 decree's allocation system had yet to be finally determined.[3]

Furthermore, it has long been recognized that the primary object of this litigation was to establish a regimen for allocating the Lower Basin waters sufficiently reliable to permit Congress and Arizona to go forward with the Central Arizona Project, a massive public works effort to make Colorado River water available to agricultural interests in central Arizona. Tuttle Report 38–39; Meyers, The Colorado River, 19 Stan. L. Rev. 1, 73 (1966) (hereinafter Meyers). That purpose has been accomplished. The Central Arizona Project was authorized in 1968, and construction has now reached an advanced stage. But even at this late date the Project is still several years from completion. And until it is ready to begin diverting Colorado River water, the allocation system in our 1964 decree has little practical importance, because Arizona lacks the capacity to use most of the water rights allocated to it in the 1964 decree.

In sum, the interest in "finality" does not dispose of this case. Principles of judicial economy provide the sole basis for the Court's refusal to correct the 1964 decree. But no significant adjudicative resources were expended on the omitted lands claims in the proceedings prior to the 1964 decree, because they were not raised at all. And, although the United States' failure to identify the omitted irrigable lands 25 years ago should not be excused, I cannot join in depriving the Tribes permanently of significant rights to water on that basis alone, especially when I see little prejudice to the

---

[3] The 1979 decree was handed down before we acted on the Tribes' motions to intervene or any of the claims now before the Court. The decree expressly left these matters open for resolution and referred them to Judge Tuttle as Special Master. *Id.*, at 421–422, 436–437.

States from reopening the 1964 decree to the extent necessary to correct the error.[4]

## B

The Tribes will suffer a manifest injustice if we fail to consider the omitted lands claims. Under the uncorrected 1964 decree, the Tribes stand to lose forever valuable rights to which they are entitled under the Court's construction of the Executive Orders creating their reservations, 373 U. S., at 595–601. This loss occurs entirely because the United States failed to perform its obligations as trustee and advocate to present evidence to the Court of *all* irrigable lands within the reservations, or at least to make a record of its justification for not presenting such evidence.

It is certainly not the case that the United States made a considered decision to waive the Tribes' claims to water for the omitted lands. Cf. *ante*, at 617–618, n. 7, and 622–623, n. 14 (suggesting otherwise). The existence of some omitted

---

[4] The Court suggests that if we reopened the question of irrigable acreage we would also have to reconsider the "irrigable acreage" standard itself. See *ante*, at 625–626. In raising that specter, the Court ignores the obvious distinction between the standard and its application to the omitted lands. No issue was the subject of more controversy in the proceedings leading up to our 1964 decree than the "irrigable acreage" standard. Unlike the actual quantification of the acreage, the standard was discussed extensively, both in Special Master Rifkind's report, at 257–266, and in the Court's opinion, 373 U. S. 546, 600–601 (1963). The "irrigable acreage" standard *has* been fully and fairly litigated. Nor does the Court's opinion or Special Master Rifkind's report indicate that some other standard of measurement would have been chosen had the Court been apprised of the irrigable acreage in the omitted lands. This Court adopted the "irrigable acreage" standard for the reasons stated in its opinion—it is the only "feasible and fair way by which reserved water for the reservations can be measured," *id.*, at 601. It reflects the purposes for which the reservations were created, and once final it need not be readjusted in light of changed circumstances, unlike an equitable measure linked to current or expected population. If a few acres worth of water more or less would have changed our decision, we would not have rejected the argument that Indian water rights be determined by familiar equitable principles rather than by the more objective standard.

irrigable lands came to light at one point in the hearings, when an agricultural specialist mentioned that some mesa lands adjacent to irrigable acreage claimed by the United States could also be irrigated.  App. to Brief for State Parties in Support of Exceptions 11.  Special Master Rifkind immediately pressed the United States' representative for an express waiver on the spot of all claims to water for irrigable acreage not identified in the pre-1964 hearings, but the attorney responded, "I am probably not authorized to give anything away that we ought to claim." *Id.*, at 12.[5]

*Heckman* v. *United States*, 224 U. S. 413 (1912), see *ante*, at 627, does not require us to make the Tribes bear the cost of the United States' error.  The relevant question in *Heckman*, raised by non-Indian defendants, was whether individual Indians were necessary parties in a suit by the United States to set aside conveyances by those Indians of lands they were forbidden by statute to alienate, and over which the United States had significant trust responsibilities.  224 U. S., at 444.  The Court held that the United States had power to enforce the statutory restrictions without the acquiescence of the Indians, and that by virtue of the restrictions the individual Indians had no interest in the subject matter of the suit.  *Id.*, at 445.  In passing, the Court noted that representation of Indian interests by the United States "traces its source to the plenary control of Congress in legislating for the protection of the Indians under its care, and it recognizes no limitations that are inconsistent with the discharge of the national duty." *Ibid.*

---

[5] See *ante*, at 622–623, n. 14.  A close reading of the exchange between Special Master Rifkind and the Government attorney reveals that the Special Master did not continue to press his demand for a binding waiver.  In light of the United States' delicate trust responsibilities in Indian water cases, it would have been improper to require the attorney to make a split-second decision to concede an important class of claims in response to surprise testimony from a witness.  Cf. Manual for Complex Litigation § 1.80, p. 89 (1982); Chayes, The Role of the Judge in Public Law Litigation, 89 Harv. L. Rev. 1281, 1291, 1297–1298 (1976).

Were it not for the trust relationship recognized in *Heckman* and other cases, the United States' litigation decisions could not estop the Tribes, who were not separately represented. Insofar as *Heckman* intimates that the United States' power to compromise Indian interests is not subject to judicial scrutiny, it has long since been repudiated by this Court. See, *e. g., Shoshone Tribe* v. *United States,* 299 U. S. 476 (1937); *United States* v. *Creek Nation,* 295 U. S. 103, 110 (1935); *Cramer* v. *United States,* 261 U. S. 219, 227–229 (1923). Instead, we have recognized that the United States' relationship to Indian interests is much like that of a fiduciary to a beneficiary. Under the modern view, the "discharge of the national duty" requires sharp attention to the quality of the United States' fulfillment of its trust obligations, including the obligation to represent Indian interests in litigation.

There has often been reason to question the quality of that representation, especially when rights to scarce water in the West were at stake. In 1973, the National Water Commission reported: "In the history of the United States Government's treatment of Indian Tribes, its failure to protect Indian water rights for use on the Reservations it set aside for them is one of the sorrier chapters." National Water Comm'n, Water Policies for the Future—Final Report to the President and to the Congress of the United States 475. President Nixon admitted as much in a 1970 message to Congress:

"The United States Government acts as a legal trustee for the land and water rights of American Indians. These rights are often of critical economic importance to the Indian people; frequently they are also the subject of extensive legal dispute. In many of these legal confrontations, the Federal government is faced with an inherent conflict of interest. The Secretary of the Interior and the Attorney General must at the same time advance *both* the *national* interest in the use of land and

water rights *and* the *private* interests of Indians in land which the government holds as trustee.

". . . There is considerable evidence that the Indians are the losers when such situations arise." H. R. Doc. No. 91–363, pp. 9–10, 116 Cong. Rec. 23261 (emphasis in original).

The Court carefully explains that the United States had no "actual conflict of interest" with regard to Lower Basin water rights, by which it apparently means that the recognition of Indian water rights did not diminish other federally reserved water rights. See *ante,* at 627. I agree. Nevertheless, history discloses that the United States has not always taken such a narrow view of its interests in water rights controversies. On the Colorado River and elsewhere, it has constructed extensive water projects to serve nonfederal interests; congressional authorization of the Boulder Canyon Dam was the crucial event in the development of the Lower Basin, shaping this litigation from its inception. See 373 U. S., at 564–590. The United States has sometimes been slow to press Indian claims when they conflicted with those of politically influential non-Indian interests. See, *e. g., Pyramid Lake Paiute Tribe* v. *Morton,* 354 F. Supp. 252, 256–257 (DC 1973). See generally Federal Protection of Indian Resources: Hearings before the Subcommittee on Administrative Practice and Procedure of the Senate Committee on the Judiciary, 92d Cong., 1st Sess., 235–249, 907–914 (1971) (hereinafter Senate Hearings); F. Cohen, Handbook of Federal Indian Law 596–599 (1982) (hereinafter Cohen).[6] We

---

[6] There are many ways of compromising a claim besides making a decision not to press it. Devoting fewer resources to investigating and preparing the claim than its economic importance would warrant has the same effect. In cases such as this, the Justice Department is responsible for pressing the Indians' claims in court, but the Interior Department and the experts it employs are responsible for developing the facts of the claim and bringing it to the attention of the Justice Department. The practical result of this bifurcated responsibility may often be to confer effective

should not, therefore, leap to the conclusion that the irrigability of *all* reservation lands, including the omitted lands, "was fully and fairly litigated in 1963," *ante*, at 628.

This case provides proof (if any is needed) that those with direct interests—economic, historical, spiritual—in the outcome of a case are their own best representatives. Upon entering this litigation, the Tribes swiftly exposed the extent of the United States' pre-1964 neglect. I would not hold that the United States had so violated the ordinary standards of attorney care as to be liable for "inadequate" representation of the Indian interests in this litigation, if that were the standard of liability, on the basis of the mere fact that it failed to claim water rights for some irrigable acreage. But I do not find in this record any justification for the United States' failure to present evidence on the omitted lands. Even if the United States did intend to waive the omitted lands claims, I see no good reason, before final judgment, to deny the Tribes a hearing on claims that have never been litigated. As a matter of justice, the Tribes deserve this chance to defend rights which should have been theirs.

C

In deciding whether to correct the 1964 decree, we should also consider any possible prejudice which the States might suffer as a result. Of course, the States would prefer that we not allocate additional water rights to the Tribes; at least at some point in the future, additional Indian rights may make the rights of junior state appropriators less certain. With regard to timeliness and finality, however, prejudice means prejudice from procedure rather than from the result. Hence, the important question is whether the States would

---

power to waive Indian claims on Interior Department hydrologists and agricultural experts. See Senate Hearings 445–449 (testimony of W. Kiechel, Jr., Deputy Assistant Attorney General, Land and Natural Resources Division).

be any worse off because the additional Indian rights were confirmed in 1983 rather than 1964.

The Special Master considered this issue at length and determined that the States would not be significantly prejudiced by adjustments in the 1964 decree. Tuttle Report 38–46.[7] The whole question of reliance by the States, however, involves the highest degree of speculation. First, the amount of water entering the Lower Basin at Lee Ferry, Ariz., and available for use by Lower Basin interests has historically averaged far more than the 7.5 million acre-feet contemplated by the 1964 decree. See Rifkind Report 117. Until far more development occurs in the Upper Basin States, that situation can be expected to continue. Furthermore, improvements in irrigation, farming, and conservation technology may well permit more efficient exploitation of the present and future quantities of available water, so that more users will be accommodated by the same or less amounts of water.

In addition, the Tribes are not currently able to use all the rights allocated to them under the 1964 decree.[8] Until sub-

---

[7] The Special Master observed that in 1968 Congress authorized construction of the Central Arizona Project based on projections of mainstream flows available for diversion by Arizona far lower than current projections, so that it is not possible to argue that the Central Arizona Project would not be commercially viable if the Indians receive additional water rights. Tuttle Report 38–41; see S. Rep. No. 408, 90th Cong., 1st Sess., 18–21, 32–35 (1967). The Special Master also found that water would be available to meet the full diversion capacity of water projects begun by Nevada after 1964. Tuttle Report 44–46. The Metropolitan Water District of Southern California—the junior major appropriator in California—presented some evidence of reliance, but did not "fully explain why [it] will receive less water if the Tribes receive additional water rights." *Id.*, at 42. In any event, under current projections of demand the Metropolitan Water District will not be ready to use its existing entitlements before the year 2010. *Ibid.*

[8] From 1975, when the Fort Mojave Tribe began to use its water for the first time, through 1981, the Tribes collectively diverted only 77% of the water to which they were entitled under the 1964 decree. In individual

stantial new irrigation systems or industrial plants are built, any additional water rights that the Tribes receive will have little or no practical effect on the availability of water to other Lower Basin interests. The Tribes can probably lease their rights to others with the consent of the United States, but they have not explored this option extensively. See Cohen 592–593; Meyers 71; cf. 2 Op. Solicitor of Dept. of Interior Relating to Indian Affairs 1917–1974, p. 1930 (1964). Even if the Tribes leased all of their rights to other Lower Basin users, it would merely mean that existing interests with the means to divert water from the Colorado River would pay a market rate for additional water. If the Tribes do not lease their rights, the water will simply be available for use by other Lower Basin interests, in accord with the allocation system established by the 1964 decree. In any event, non-Indian users will not be deprived of water in the near future on account of the rights at issue in this case.

In sum, correcting the 1964 decree to reflect additional irrigable acreage in the omitted lands would not harm the States more than they would have been harmed had the omitted lands been considered in framing the 1964 decree. In truth, Indian water rights are unlikely to affect state interests to any significant degree until well into the next generation,

---

years, diversions ranged from 83% of the 1964 decree awards (1981) to 72% (1978). U. S. Dept. of Interior, Bureau of Reclamation, Compilation of Records in Accordance with Article V of the Decree of the Supreme Court of the United States in *Arizona* v. *California* Dated March 9, 1964—Calendar Years 1925–1981. The Chemehuevi diverted no water at all, although they are entitled to 11,340 acre-feet a year, *ibid.*, because there appears to be no diversion system in place on their reservation, either for purposes of irrigation or for other development. See Senate Hearings 1075 (testimony of R. Esquerra). The Special Master's Report makes clear that substantial capital investment would be required before the Tribes could begin to use additional water. See, *e. g.*, Tuttle Report 165–184, 242–248. On the Fort Mojave Reservation alone the United States' expert estimated that over $2.1 million would be required to develop six units of land for which the United States claimed additional water rights. See United States Exhibits 132–140.

when all concerned will have had plenty of time to prepare. Yet if we foreclose the Tribes now from asserting their rights to water for the omitted lands, those rights will be lost forever, through no fault of their own. The balance of hardships in this case is decidedly in the Tribes' favor. In order to avert a manifest injustice to the Tribes before this litigation becomes final and the allocation system in the 1964 decree begins to have a practical effect, I would reopen the 1964 decree to recognize additional water rights for the Tribes.

## II

Reasonable judges might differ over some aspects of this case, but I would not have thought the Special Master's solution to the boundary lands controversy was among them. The Court's failure to approve a decree that includes a quantification of the water rights appurtenant to the disputed boundary areas serves no discernible purpose, and it is profoundly inconsistent with its emphasis in Part IV of its opinion on the ideals of finality, judicial economy, and predictability of water rights. At no point does the Court explain its rejection of the Special Master's entirely reasonable proposal regarding the boundary lands.

In our 1963 opinion, we rejected Special Master Rifkind's *de novo* determination of boundary disputes concerning two of the reservations, 373 U. S., at 601, and our 1964 decree was left open to the extent of permitting an award of additional water rights should the boundaries be "finally determined," Art. II(D)(5), 376 U. S., at 345. The 1979 decree recognized that the actual boundaries of all five reservations are subject to dispute. 439 U. S., at 421–422. At the outset of the current phase of this litigation, all parties agreed that it was time to bring the maximum degree of certainty possible to the Lower Basin allocation system, a task requiring "final determination" of the disputed boundaries, at least for the purpose of quantifying the Tribes' entitlement to water. The United States and the Tribes urged before the Special Master that certain administrative determinations by

the Secretary of the Interior had finally determined the boundaries of the reservations, where the disputed boundaries lay between reservation land and other federal lands.[9] The States argued, as they had in 1963, that this Court should determine the relevant boundaries *de novo*.

The Special Master chose a middle course, calculated to put an end to further litigation in this Court. He took evidence on and determined the amount of irrigable acreage within the boundaries recognized by the Secretary of the Interior, and he calculated the corresponding water rights for inclusion in the final decree. However, he also recommended that the final decree include the following proviso:

> "Provided, further, . . . that lands presently determined for this purpose to be within the boundaries of the above-named Reservations and later determined to be outside the boundaries of the above-named Reservations, as well as any accretions thereto to which the owners of such land may be entitled, should not be included as irrigable acreage within the Reservations and that the above specified diversion requirements of such land that is irrigable shall be reduced by the unit diversion quantities listed in the [1979 decree]." Tuttle Report 282–283.

The effect of this proviso would be to grant the Indian Tribes the water rights appurtenant to the disputed boundary areas on a conditional basis. If the States succeeded in overturning any of the Secretary's boundary determinations in an appropriate forum, the corresponding water rights—precisely quantified for each area in the Special Master's Report, *id.*, at 192–196, 239–277—would automatically be subtracted from the Tribes' entitlements.

---

[9] The Court determines that other disputed boundaries have been "finally determined" by judicial adjudications that the States have not challenged. It approves amending the 1964 decree to include water rights appurtenant to these parcels. *Ante,* at 640–641. To this extent, I concur in Part V of the Court's opinion.

The advantages of the Special Master's proposal are obvious. First and foremost, it remains faithful to the approach taken in our 1963 opinion. On the one hand, it does not require this Court to decide in the first instance either what are the exact boundaries of the reservations or whether the Secretary's administrative boundary determinations are binding on all parties for all purposes. On the other hand, it settles the maximum possible extent of Indian water rights. It allows the States to rely absolutely on that figure, and it informs them precisely how much water is at stake if they choose to litigate particular boundary questions in other forums. In 1963, the same considerations led us to adopt the "irrigable acreage" standard itself. Special Master Rifkind recommended rejecting an open-ended decree because it "would place all junior water rights in jeopardy of the uncertain and the unknowable," Rifkind Report 264, whereas a fixed decree would "provide certainty for both the United States and non-Indian users," id., at 265. Finally, the Special Master's proposal would preclude further litigation in this Court over quantification of the water rights reserved for any boundary areas in fact within the reservations.

The Court disregards these virtues. Simply turning the clock back to 1964, it guarantees that the original jurisdiction litigation over Lower Basin water rights will proceed to another "round," and possibly still more "rounds" thereafter, as one-by-one the border questions are settled by litigation. If any of the Secretary's determinations are upheld, the Court will have to duplicate the efforts of the present Special Master. See ante, at 638.[10] The full extent of the Tribes' rights

---

[10] The Court seems to believe that pending litigation in the Southern District of California involving only some of the boundary issues presented by this case, as well as only some of the parties, provides an appropriate forum for resolving the boundary disputes once and for all. Ante, at 639. It suggests that other parties enter the lawsuit voluntarily, and that they use it to decide additional issues. Ante, at 639, n. 29. However, under the Court's ruling today the States have absolutely no reason to prosecute additional claims—as long as the boundary issues are not decided, the water

to divert mainstream water will remain uncertain for the near future, just as finality in this case begins to have practical importance. See *supra*, at 647.

For the reasons described in Part I–C, *supra*, awarding additional water rights to the Tribes works no immediate harm to state interests. The Court's preference for prolonging this litigation and its attendant uncertainty is at odds with the principles upon which it resolves the omitted lands issue. I would accept the Special Master's resolution of the boundary lands issue for purposes of framing a final decree in this action.

### III

The Court's disposition of the omitted lands and boundary lands issues makes it unnecessary for it to reach the remaining issues in this case. Although my own views would require us to reach those issues, I do not think it worthwhile to discuss them at any length. The States have filed a number of highly specific exceptions to the Special Master's determinations regarding the irrigability of particular parcels. Although formal concepts of "plain error" and "abuse of discretion" do not apply to the recommendations of special masters in original jurisdiction litigation, the care with which the present Special Master has explained his conclusions on these technical issues demands respect, and I would overrule the States' exceptions. The United States has also filed four exceptions. The first asks that we recognize for purposes of our decree the Secretary of the Interior's resolution of an

---

rights that turn on them belong to the States. (As defendant, of course, the United States has no choice but to litigate.) The Court also makes the unprecedented suggestion that we might be willing to decide the boundary questions *de novo* if the States' District Court suit is barred by lack of standing, sovereign immunity, or the statute of limitations. *Ante*, at 638. I would not leave that impression. Because "[c]ertainty of rights is particularly important with respect to water rights in the Western United States," *ante*, at 620, such results in the District Court would "finally determine" the boundaries of the reservations within the meaning of Article II(D)(5) of the 1964 decree.

additional border question concerning the Fort Mojave Reservation; the others involve essentially clerical matters of conforming the Special Master's recommended decree to our two prior decrees. I would sustain the exceptions of the United States.