**FORT MOJAVE INDIAN TRIBE, et al., Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**Nos. 169–89L, 170–89L.**

United States Court of Federal Claims.

Sept. 9, 1994.

Daniel H. Israel, Scottsdale, AZ, for plaintiffs.

R. Anthony Rogers and Marc A. Smith with whom was Acting Asst. Atty. Gen. Lois J. Schiffer, Washington, DC, for defendant. William Swan, Office of Field Sol., of counsel.

*OPINION*

ANDEWELT, Judge.

In these consolidated Indian claims cases, plaintiffs, the Fort Mojave Indian Tribe and the Colorado River Indian Tribe (the Tribes), seek damages from the United States for its alleged breach of trust in representing the Tribes' interests in the litigation that led to the Supreme Court's 1963 decision in *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963) (*Arizona I*). *Arizona I* is the seminal decision in which the Court allocated water rights from the Colorado River among various states and certain Indian tribes located within those states. Plaintiffs contend in this litigation that significant mistakes made by the United States in its representation of the Tribes'

interests resulted in the Court in *Arizona I* allocating to the Tribes significantly less water rights than the Tribe's should have received. In *Fort Mojave Indian Tribe v. United States,* 23 Cl.Ct. 417 (1991) (*Fort Mojave I* ), this court granted summary judgment to defendant on plaintiffs' related fifth amendment takings claim but denied summary judgment on the instant breach of trust claim. After conducting trial, and for the reasons set forth below, the court concludes that plaintiffs have not established that defendant breached its trust obligations.

In *Fort Mojave I, id.* at 420–23, this court set forth many of the background facts pertinent to the instant action. For ease of understanding this opinion, Sections I and II below include restatements, often verbatim, of Sections I and II of *Fort Mojave I.*

## I.

Plaintiffs' respective reservations were created by federal statute and/or executive orders. While these statutes and executive orders delineated the land boundaries of the reservations, they did not mention the grant of any water rights. In *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), the Supreme Court addressed the issue of Indian reservation water rights and concluded that the absence of a specific allocation of water rights in the documents creating a reservation is not dispositive and that the documents should be interpreted to contain an implied reservation of sufficient water rights for the Indian tribe to carry out the purposes for which the reservation was created. *Id.* at 575–77, 28 S.Ct. at 211–12.

*Arizona I* was an original action filed in the Supreme Court by the State of Arizona against the State of California and seven of its agencies. The State of Arizona sought therein to clarify its title to a specific amount of water from the Colorado River and its tributaries. The States of Nevada, Utah, and New Mexico were joined as parties and the United States intervened to represent both the federal interest and the interests of the Tribes and three other Indian tribes whose reservations are located within the states involved. Because Indian reservations were involved, one of the many tasks the Supreme Court faced in *Arizona I* was to apply the *Winters* standard and determine the tribes' water rights.

After the parties filed their preliminary pleadings, the Court referred the *Arizona I* action to a special master to hear evidence and recommend a decree. The hearing before the special master extended from June 1956 through August 1958 and involved the testimony of 340 witnesses, the receipt of thousands of exhibits, and a transcript of 25,000 pages.

During the special master hearing, the State of Arizona contended that the tribes' *Winters* water rights should be calculated based on the "reasonably foreseeable needs" of the tribes on their respective reservations. That standard apparently would have resulted in the Supreme Court calculating the tribes' water rights based on the actual number of Indians on each reservation, which was fairly small.[1] The United States, representing the tribes, proposed a different standard that would produce significantly higher water allotments for the tribes. The United States argued that the tribes' *Winters* water rights should be calculated so as to permit irrigation of all "practically irrigable land" on the reservations, *i.e.,* that the statutes and orders creating the reservations should be interpreted to include an implied grant of sufficient water to irrigate all practically irrigable reservation land even if the tribal members on each reservation could not farm all of the irrigable reservation land themselves. During this hearing, the United States presented evidence to show the amount of such practically irrigable land on each reservation, including the Tribes' respective reservations.

After the hearing, the special master filed a 433–page report of his findings and legal conclusions, which included a recommended decree. The special master adopted the standard proffered by the United States for calculating the tribes' *Winters* water rights.

---

1. At trial, plaintiffs' witnesses testified that the current tribal population on the Fort Mojave Indian Reservation is approximately 700, and that the current tribal population on the Colorado River Indian Reservation is approximately 1,800.

He concluded "that the water was intended to satisfy the future as well as the present needs of the Indian Reservations and ... that enough water was reserved to irrigate all the practicably irrigable acreage on the reservations." *Arizona I*, 373 U.S. at 600, 83 S.Ct. at 1497. Relying on the evidence presented by the United States, the special master also made a determination as to the precise amount of practicably irrigable land located on the respective reservations. In assessing such amounts, the special master resolved certain boundary disputes concerning the Tribes' reservations.

In *Arizona I*, the Court, in pertinent part, adopted the findings and conclusions of the special master, with the exception of the special master's determination of disputed boundaries. The Court explained as follows:

> We have concluded, as did the Master, that the only feasible and fair way by which reserved water for the reservations can be measured is irrigable acreage. The various acreage of irrigable land which the Master found to be on the different reservations we find to be reasonable.

> We disagree with the Master's decision to determine the disputed boundaries of the Colorado River Indian Reservation and the Fort Mojave Indian Reservation. We hold that it is unnecessary to resolve those disputes here. Should a dispute over title arise because of some future refusal by the Secretary [of the Interior] to deliver water to either area, the dispute can be settled at that time.

*Id.* at 601, 83 S.Ct. at 1498.

In 1964, the Supreme Court issued a decree that "carr[ied] into effect" *Arizona I. Arizona v. California*, 376 U.S. 340, 84 S.Ct. 755, 11 L.Ed.2d 757 (1964) (the 1964 decree). The 1964 decree allocated water rights among the states involved in *Arizona I* and, in Article II, defined each tribe's entitlement to water from its respective state's allotment. Pursuant to Article II, except in periods of water shortage, each state was entitled annually either to the amount of water necessary to irrigate a specified number of acres of land or to a specified number of acre-feet of water, whichever was less.[2]

During water shortages, when the annual water supply from the Colorado River measured at a specified location fell below 7.5 million acre-feet, the 1964 decree provided that the water would be allocated among the states and tribes on a priority basis without regard to state lines. Priority would be based on the dates on which the states and tribes had perfected their respective rights to the water. *Id.* at 342–43, 84 S.Ct. at 756–57. Article II granted the tribes "perfected rights" to the amount of water allocated to them in Article II for nonshortage periods. The respective priority dates for those perfected rights corresponded to the dates on which the particular parcel of irrigable acreage was made part of the respective reservation. *Id.* at 344–45, 84 S.Ct. at 757–58. Thus, for example, the water allotment corresponding to the irrigable acreage added to the Colorado River Indian Reservation on March 3, 1865, had a priority date of March 3, 1865.

## II.

The 1964 decree left open certain issues. First, in the event the disputed reservation boundaries became finally established, the Tribes' water rights were subject to adjustment by agreement or decree of the Court. *Id.* at 345, 84 S.Ct. at 758. Second, the 1964 decree lacked a full listing of "present perfected rights" and priority dates to apply when the Colorado River's annual water sup-

---

2. Article II, under subdivision (D), specified plaintiffs' water rights, in pertinent part, as follows:

> (4) The Colorado River Indian Reservation in annual quantities not to exceed (i) 717,148 acre-feet of diversions from the mainstream or (ii) the quantity of mainstream water necessary to supply the consumptive use required for irrigation of 107,588 acres and for the satisfaction of related uses, whichever of (i) or (ii) is less....

> (5) The Fort Mojave Indian Reservation in annual quantities not to exceed (i) 122,648 acre-feet of diversions from the mainstream or (ii) the quantity of mainstream water necessary to supply the consumptive use required for irrigation of 18,974 acres and for the satisfaction of related uses, whichever of (i) or (ii) is less....

*Id.* at 344–45, 84 S.Ct. at 758.

ply fell below 7.5 million acre-feet. On the latter issue, Article VI proposed that the Secretary of the Interior and the states secure an agreement as to present perfected rights and priority dates. If such an agreement could not be reached, any party could apply to the Court under Article VI for such a determination. *Id.* at 351–52, 84 S.Ct. at 761–62. In addition, Article IX broadly authorized any party to apply for an amendment to the 1964 decree. Article IX provides:

> Any of the parties may apply at the foot of this decree for its amendment or for further relief. The Court retains jurisdiction of this suit for the purpose of any order, direction, or modification of the decree, or any supplementary decree, that may at any time be deemed proper in relation to the subject matter in controversy.

*Id.* at 353, 84 S.Ct. at 762.

The parties initially were unable to reach agreement pursuant to Article VI as to present perfected rights and priority dates. In May 1977, the state plaintiffs filed a motion requesting the Supreme Court to resolve these issues. In 1978, the Tribes filed motions to intervene. The Tribes' motions, however, were not limited to Article VI issues. The Tribes sought resolution of existing boundary disputes left open in the 1964 decree and, in addition, sought recalculation of the water rights granted in Article II for certain land indisputably within their respective reservations. On the latter point, the Tribes alleged that their respective Article II allocations were too low because certain practicably irrigable lands within their reservations had not been included as such when making the Article II allocations (hereinafter "the omitted acreage"). In their motions, the Tribes blamed the United States for failing originally to submit proof as to the omitted acreage and charged that the United States had had a conflict of interest in *Arizona I* because it represented other interests than those of the Tribes.

In making these allegations, the Tribes apparently relied upon an August 13, 1975, memorandum prepared by William H. Veeder, a government attorney who had repre-

sented the United States in *Arizona I* until he was removed from the case in 1955 or 1956. The memorandum alleged that the United States had a conflict of interest when it represented the Tribes in *Arizona I* and specified the practicably irrigable acreage that the United States had omitted from its proof at trial.

The United States initially opposed the Tribes' motions to intervene but later reversed its position and indicated that it would not oppose intervention by the Tribes so long as that intervention occurred after entry of a supplemental decree covering Article VI issues. On December 22, 1978, the United States went further and filed its own motion seeking entry of a supplemental decree granting the Tribes additional water rights. The United States acknowledged that it originally had erred in failing to present evidence concerning the omitted acreage and argued that the Tribes' water rights should be increased to reflect this omitted acreage. The United States recommended appointment of a special master to reconsider the allocation of water rights. The United States expressed the view that the 1964 decree did not foreclose reconsideration of the Article II allocation of water rights and that the Supreme Court properly should reach the merits of whether the omitted acreage was practicably irrigable.

On January 9, 1979, the Supreme Court entered a supplemental decree, *Arizona v. California,* 439 U.S. 419, 99 S.Ct. 995, 58 L.Ed.2d 627 (1979) (the supplemental decree), addressing the issues specifically left open in Article VI of the 1964 decree. The Supreme Court referred the Tribes' claims for an increase in their Article II water rights to a special master. After conducting hearings, the special master granted the Tribes' motions to intervene and issued an opinion recommending that additional acreage be added to the water rights allotted to the Tribes in Article II of the 1964 decree. *Inter alia,* the special master agreed that the United States did not include certain practicably irrigable reservation land in calculating water rights in *Arizona I* and recommended a corresponding modification of Article II of the 1964 decree.

On review, the Supreme Court rejected the special master's proposal to modify Article II to reflect water rights attendant to the omitted acreage. In a March 30, 1983, decision, the Court stated that "the principles of res judicata advise against reopening the calculation of the amount of practicably irrigable acreage, and Article IX [of the 1964 decree] does not demand that we do so." *Arizona v. California,* 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) (*Arizona II*). In refusing to reopen these calculations, the Court appeared to rely in significant part on its "fear that the urge to relitigate, once loosed, will not be easily cabined." *Id.* at 625, 103 S.Ct. at 1394. The Court explained as follows:

> The States have already indicated, if the issue were reopened, that the irrigable-acreage standard itself should be reconsidered in light of our decisions in *United States v. New Mexico,* 438 U.S. 696 [98 S.Ct. 3012, 57 L.Ed.2d 1052] (1978), and *Washington v. Washington Commercial Passenger Fishing Vessel Assn.,* 443 U.S. 658 [99 S.Ct. 3055, 61 L.Ed.2d 823] (1979), and we are not persuaded that a defensible line can be drawn between the reasons for reopening this litigation advanced by the Tribes and the United States on the one hand and the States on the other. It would be counter to the interests of all parties to this case to open what may become a Pandora's Box, upsetting the certainty of all aspects of the decree.

*Id.*

### III.

Plaintiffs' contention in the instant action that the United States breached its trust in representing the Tribes' interests during *Arizona I* generally rests on the same issues as those raised in the Veeder memorandum and presented to the Supreme Court in *Arizona II*. In the 1964 decree, 376 U.S. at 344–45, 84 S.Ct. at 757–58, the Supreme Court granted the Tribes water rights for a total of 126,562 acres on the reservation lands that the Court had concluded were practicably irrigable. Plaintiffs contend that had the United States represented the · Tribes' interests in a manner consistent with its trust responsibilities, the Tribes' could

have secured water rights for an additional 26,293 acres of practicably irrigable land on their respective reservations. As monetary damages, plaintiffs seek the value of the water rights lost.

In *Fort Mojave I,* this court concluded that the United States waived sovereign immunity so as to authorize the instant breach of trust action. The court articulated the standard under which plaintiffs' breach of trust claim would be evaluated as follows:

> Where a trust relationship exists, "[t]he trustee has a duty to protect the trust property against damage or destruction. He is obligated to the beneficiary to do all acts necessary for the preservation of the trust res which would be performed by a reasonably prudent man employing his own like property for purposes similar to those of the trust." G. Bogert, *The Law of Trusts and Trustees* § 582 (2d ed. revised 1980); *see also Restatement (Second) of Trusts,* § 176 (1959).
>
> Here, the title to plaintiffs' water rights constitutes the trust property, or the res, which the government, as trustee, has a duty to preserve. Defendant's obligation to perform "all acts necessary" to preserve the trust res would necessarily include prudently representing plaintiffs' interests in litigation in which ownership to those water rights is placed in issue.

*Fort Mojave I,* 23 Cl.Ct. at 426.

### IV.

As the party instituting suit, plaintiffs have the burden of proof to demonstrate that defendant breached the trust obligation it owed to the Tribes when it represented the Tribes' interests before the special master and the Supreme Court in *Arizona I*. The alleged breach of trust occurred over three decades ago and, unfortunately for plaintiffs, this passage of time apparently has hampered plaintiffs' ability to carry their burden. Many of the men and women who participated in the litigation that led to *Arizona I* are now either deceased or not in a position to add much clarity on the crucial issues as to why the United States took the actions it did in *Ari-*

*zona I.*[3] The absence of oral testimony has forced plaintiffs to rely largely upon the written record. But that record has brought with it its own limitations. Not surprisingly, over the past 30 plus years, many of the records that describe the government's actions at the relevant time have been destroyed.[4] Moreover, the documents that have been located often do not explain why the government took the actions that it did. Many of these documents are not self explanatory and without being able to consult the authors, they are of limited help.

Given the lack of significant contemporaneous witnesses and the reliance on the written record, the parties' presentations during trial can be characterized as a "battle of experts." The experts reviewed the available documents, attempted to determine the analytical process the United States employed in calculating the practicably irrigable acreage on the reservation lands, and then offered their expert opinions. Defendant's experts generally concluded that the government's actions were either correct or at least reasonable when placed in a historical context. Plaintiffs' experts classified these same actions as improper and as constituting a breach of trust when viewed under the standards applicable at the time of *Arizona I.* Defendant presented the expert testimony of Dr. Mesghinna, an expert in agriculture engineering with a specialty in determining practicably irrigable acreage; Clifford R. Landers, a soil scientist with a specialty in practicably irrigable acreage studies; James P. Merchant, an expert in economics with expertise in practicably irrigable acreage analysis; and Wayne D. Criddle, an expert in irrigation engineer-

ing and the history of sprinkler irrigation. Plaintiffs presented the expert testimony of A.T. Kersich, an expert in the development of practicably irrigable acreage claims for litigations involving Indian water rights; Dr. Scott Hathorn, Jr., an expert in agricultural economics in Arizona and California; and Professor David H. Getches, an expert on the law of the Colorado River.

At this point in the decision, it is appropriate to state one conclusion. The Veeder memorandum suggests that the United States may have failed to claim water rights on certain of the disputed reservation land because it had a conflict of interest. Plaintiffs' experts, however, were unable to provide significant additional evidence to support such a claim. Plaintiffs simply failed to demonstrate at trial that in preparing and presenting the Tribes' case, the United States acted other than in a good faith effort to promote the Tribes' interests.

## V.

Given the seminal nature of *Arizona I,* it is not surprising that in subsequent litigation the practicably irrigable acreage (PIA) standard adopted in *Arizona I* was applied to other Indian reservations. The parties' experts herein explained at trial that the PIA inquiry has evolved into an economic analysis in which experts in different fields come together to make determinations as to the amount of practicably irrigable land on a given Indian reservation. In making these PIA determinations, the experts analyze the potential cost/benefit ratios of hypothetical irrigation projects that potentially could be employed to irrigate the reservation land so

---

3. For example, the parties presented to the court the tape recorded deposition testimony of Robert H. Rupkey, who was actively involved in calculating the amount of practicably irrigable land on the Tribes' reservations in *Arizona I.* Rupkey, who retired from the Bureau of Indian Affairs in 1969, was an engineering expert for the United States in the *Arizona I* litigation. While this court was impressed by Rupkey's ability to remember certain events relating to *Arizona I,* overall, Rupkey was unable to recall events in sufficient detail for the court to rely significantly upon his testimony.

4. One of defendant's expert witnesses, Dr. Woldezion Mesghinna, attempted to gather and re-

view the relevant documents from government storage facilities. He was unable, however, to find documents relating to certain relevant facts, apparently in part because a considerable number of documents had been destroyed. For example, Dr. Mesghinna testified that 100 or 150 boxes of documents relating to *Arizona I* existed at a repository in Window Rock, Arizona, but were inadvertently destroyed just weeks before he was informed of their existence. In addition, Dr. Mesghinna concluded that many of the discussions that led to the United States' final determinations in *Arizona I* had never been documented in written form.

as to permit farming. The experts define the metes and bounds of these irrigation projects and the crops to be grown. As a general matter, if the return from the expected crops exceeds the costs of a project, that land is deemed practicably irrigable and water rights are claimed for that acreage.

The procedure for making these PIA determinations involves three areas of expertise—soil science, engineering, and economics. Each of these areas assumes primary responsibility at a different stage in the PIA analysis. The initial focus of the PIA inquiry is land classification, where the soil scientist determines the largest area of arable land that reasonably can be considered for an irrigation project. Next, utilizing this arable land base, the engineer evaluates the available water supply and designs an irrigation system, which typically covers a smaller area than the available arable land base. Finally, the economist develops the cropping patterns, yields, prices, and ultimately the net returns for the crops that the project might support. In general, the PIA analysis is grounded upon project development with the overall goal of maximizing the income from the project and not maximizing the water claim. Hence, when creating an irrigation project, the economist will not use money earned from farming profitable parcels of land to subsidize marginal unprofitable land. Thus, under the PIA process as it has developed, not all arable land is included as practicably irrigable acreage.

## VI.

The above description is the modern-day view of how to make a PIA determination. When evaluating plaintiffs' claim of breach of trust, however, it is crucial to evaluate the government's actions at the time the actions were taken rather than with the benefit of the crisp vision of hindsight. When the United States was litigating *Arizona I*, not

only did it lack precedent in which experts applied PIA standards, but it also lacked the benefit of an established PIA standard. As described above, *Winters* merely granted Indian tribes water rights sufficient to carry out the purposes for which their reservations were created and did not explain how to translate that standard into a specific quantity of water rights. Thus, in representing the Tribes' interests in *Arizona I*, the United States was faced with dual responsibilities. First, it had to design and convince the court to adopt a particular standard for calculating the Tribes' water rights. Second, it had to apply that standard, as well as any other standards the Court may have adopted, to the facts of the case so to assure that the Tribes received the water rights to which they were entitled.

This dual nature of the United States' responsibility is an important focus when evaluating whether defendant breached its trust responsibilities when representing the Tribes' interests in *Arizona I*. First, the court must recognize that the United States achieved a significant and hard-fought victory when it convinced both the special master and the Supreme Court in *Arizona I* to adopt its proposed PIA standard.[5] Had the Court instead adopted the alternative standard proposed by the State of Arizona, the Tribes apparently would have received significantly less water rights than they did.

Second, certain strategic considerations potentially come into play when a litigant is seeking to encourage a court to adopt a disputed standard rather than merely to apply an established standard. A litigant seeking to encourage a court to adopt a disputed standard may determine, for strategic reasons, to be less aggressive in applying the proposed standard than the litigant would have been had the standard previously been established. For example, to encourage a

---

5. In *Arizona I*, 373 U.S. at 601, 83 S.Ct. at 1498, the Supreme Court indicated that the practicably irrigable standard is "the only feasible and fair way by which reserved water for the reservations can be measured." But in *Arizona II*, the Court suggested the potential viability of other standards when the Court declined to adopt the special master's recommendation to grant the Tribes' additional water rights. As described

above, the Court noted that if this issue were reopened, the certainty of *Arizona I* could be lost because a Pandora's box of issues would arise including the consistency of the practicably irrigable acreage standard with other Supreme Court cases. If the practicably irrigable standard was so obviously correct, then it is not apparent why the Court would have viewed its re-examination as potentially significant.

court to adopt a disputed standard, a litigant may seek to make an application of that standard seem as straightforward and free from substantial dispute as possible. A highly aggressive application of the standard could produce additional complexity, require resolution of many more disputes, and potentially convince a court that the proposed standard is not appropriate for resolving the dispute. In this regard, the Colorado River has a finite amount of water and any water rights awarded to the Tribes in effect would be taken from others. To the extent the special master viewed the United States as overreaching its claim to irrigable acreage or viewed the PIA standard as too complex to apply in *Arizona I* and future cases, the special master may have been more inclined to adopt a different standard.

Third, when a litigant is proposing a novel standard, the litigant does not have the benefit of relying on case law applying that standard. Hence, the litigant must make tactical decisions as a matter of first impression.

Thus, plaintiffs ask this court to conclude that the United States' representation of the Tribes' interests in *Arizona I* was so egregious as to amount to a breach of trust in a setting where (1) the individuals who allegedly committed the breach of trust are either deceased or not in a position to explain or defend their actions, (2) the contemporaneous written record has significant gaps, (3) the United States in *Arizona I* won a hard-fought victory highly beneficial to the Tribes concerning the applicable standard for quantifying water rights, (4) there were potential strategic reasons for the United States to temper its aggressiveness in applying the proposed PIA standard to the Tribes' reservations, (5) the United States had no significant precedent upon which to rely when presenting its PIA claim, and (6) plaintiffs failed to demonstrate that any of defendant's actions undertaken during *Arizona I* were taken in bad faith or as a result of a conflict of interest. Given this setting, the court cannot conclude that defendant acted imprudently and breached its trust obligations to plaintiffs unless the available evidence indicates that the United States lacked any reasonable basis for failing to make a PIA claim for the omitted acreage. For the reasons described below, when viewed in the context of the entire record, the explanations that defendant's experts offered as to the actual or likely rationales underlying the United States' litigation decisions in *Arizona I* appear reasonable and support the conclusion that the United States acted prudently and had a reasonable basis in failing to make a PIA claim for the omitted acreage.

### VII.

Plaintiffs criticize the government's PIA determination in five major respects and argue that these errors led to the omission of water rights for 26,293 acres of practicably irrigable land on the Tribes' respective reservations. Plaintiffs contend that defendant failed to (1) employ land classification as the first step in the PIA analysis, (2) engage in appropriate economic analysis, (3) consider the ability of sprinkler technology to increase the arability of the land, (4) claim as practicably irrigable those lands that United States engineers designated for flood detention or routing for flash floods off mesas, and (5) claim water rights for lands adjacent to the Colorado River.[6]

---

6. In their post-trial briefs, plaintiffs apparently allege for the first time that the Bureau of Indian Affairs (BIA) experts set aside too much of the practicably irrigable acreage on the Tribes' respective reservations to allow for such structures as roads, ditches, and canals. But even assuming this allegation is timely, plaintiffs' argument adds little to their breach of trust claim because the BIA appears to have calculated these reductions reasonably. For the Colorado River Indian Reservation, based upon then-existing on-site conditions, the BIA determined that a 12 percent reduction was appropriate. ("Of the total area presently developed approximately 8% is used for road, canals, laterals, drains and townsites. Assuming 5% for farmsteads and farm ditches ....") While defendant did not present trial evidence addressing these reductions on the Fort Mojave Indian Reservation, the BIA's 10 percent reduction is consistent with the 1953 United States Bureau of Reclamation (USBR) Manual which provides that "[o]n the average, four percent of the land is required for rights-of-way in a fully developed area," and another "six percent is required for nonproductive farm use such as farmsteads, farm roads, and farm ditches." The USBR Manual also states that "[t]he amount of reduction should be estimated for each project in accordance with the size and type of farm."

**(1)** *Land Classification*

Experts at the Bureau of Indian Affairs (BIA) conducted the land classification surveys that supported the government's PIA claim in *Arizona I*. Plaintiffs' trial experts criticized the BIA's approach in *Arizona I* in a report prepared prior to trial. These experts claimed that the BIA improperly established the boundaries of the irrigation project prior to examining the soil for arability, and thereby erroneously failed to evaluate potentially arable soil located outside the project area.

Defendant successfully countered this contention at trial. Defendant's experts, Dr. Mesghinna and Landers, demonstrated that the BIA experts had adequate knowledge of soil arability prior to establishing the project boundaries. The BIA experts relied upon historical land studies of the Tribes' respective reservations,[7] as well as reconnaissance level studies conducted in 1954 and 1955. The reconnaissance level studies were broadly inclusive soil surveys intended to eliminate obviously nonarable land from irrigable projects and to facilitate the determination of the project boundaries.

Next, plaintiffs' experts alleged in their pretrial report that the BIA had used incorrect standards when classifying the Tribes' reservation lands. The BIA used classification standards it had developed in 1956, which are referred to as "Land Capability Standards." These standards were derived from information and methodologies used by the United States Soil Conservation Service and the Bureau of Reclamation, and from the personal experiences of the BIA experts. Plaintiffs' experts argued that in *Arizona I* the BIA instead should have based its classification of the soil on the Tribes' respective reservations on land classification specifications developed in a 1952 Bureau of Reclamation report covering the Nevada portion of

the Fort Mojave Indian Reservation. Plaintiffs' experts argued that using these latter standards would be more accurate than the more general Land Capability Standards, and that had the BIA employed these latter land classification standards in *Arizona I*, land mapped as nonarable in 1956 would have been classified as arable.

Taken in its entirety, the pertinent trial testimony supports the conclusion that the BIA's use of Land Capability Standards, which did include Bureau of Reclamation information, was a reasonable approach to the problem the BIA faced. Indeed, the evidence supports the conclusion that the Land Capability Standards were fairly liberal in approach and constituted a fairly aggressive definition of PIA. For example, the 1956 Land Capability Standards were based on the assumption, which was favorable to the Tribes, that future control of the Colorado River would render more lands arable. In addition, one of defendant's experts, Landers, testified that had the BIA instead used the 1952 Bureau of Reclamation land classification specifications, more than 25,000 acres on the Colorado River Indian Reservation that was classified as practicably irrigable might have been excluded from the *Arizona I* PIA claim.

Plaintiffs' position with respect to land classification appeared to evolve somewhat during trial. Plaintiffs suggested that rather than substituting the 1952 Bureau of Reclamation standards for the BIA's Land Capability Standards, the BIA should have supplemented the Land Capability Standards based upon the Bureau of Reclamation's experience on the Tribes' respective reservations. But plaintiffs did not provide any specific land classification standards or arability data that would have resulted from combining such standards. Hence, the court is not able to compare the amount of practicably irrigable acreage that would have re-

---

**7.** The BIA experts reviewed a 1920 comprehensive study of the irrigation potential of the Colorado River Indian Reservation by C.A. Engle, a United States Indian Irrigation Service engineer; a 1937 joint United States Soil Conservation Service and BIA soil survey of the irrigable land on the Fort Mojave Indian Reservation; a 1941 soil reconnaissance survey and a land classification study on the Arizona side of the Colorado River

Indian Reservation by W.G. Harper, a soil scientist for the Office of Indian Affairs; a 1946 soil survey of the lower and mesa lands on the Arizona side of the Colorado River Indian Reservation by John C. Walker, a soil scientist for the United States Indian Service; and a 1952 Bureau of Reclamation land classification study of the Nevada portion of Fort Mojave Indian Reservation.

sulted from plaintiffs' approach to the BIA's 1956 Land Capability Standards.[8] Moreover, defendant's soil expert, Landers, disagreed with plaintiffs' proposed approach. Landers testified that to have any validity, land classification standards must be developed objectively and he suggested that tilting the standards to incorporate only the most favorable aspects of sandy soils, which is the effect of plaintiffs' plan, would have been an inappropriate methodology and would have generated too inclusive a set of land classification standards. Landers also explained that in the absence of an actual set of land classification standards, it is difficult to determine whether plaintiffs' suggested approach would have resulted in more or less soil being determined arable.

Based on all of the evidence, the court concludes that the BIA possibly could have taken a different approach to land classification. But plaintiffs simply did not establish at trial that the approach the BIA did take in representing the Tribes' interests in *Arizona I* was imprudent, unreasonable, or otherwise inconsistent with the government's trust obligations owed to the Tribes.

### (2) *Economic Analysis*

Plaintiffs criticize the BIA for failing to carry out appropriate economic studies. Plaintiffs' experts alleged in their pretrial report, *inter alia*, that "[a] full economics evaluation does not appear to have been developed during the 1950's initial identification of irrigable lands presented in [*Arizona I*].... Indeed, without any detailed consideration of economics (the United States acknowledged economics only in a general broad sense as pointed out in the United States' testimony, such as 'we did it before' or 'this was what was being done in the area'), substantial parcels were nevertheless accepted as irrigable by the Court."

With respect to the lower lands on the Arizona side of the Colorado River Indian Reservation, defendant's economic expert, Merchant, testified that a detailed economic feasibility study was unnecessary for determining the practicably irrigable acreage for the Colorado River Indian Reservation's main 100,000–acre irrigation project. Congress had authorized that project in 1935 based on studies showing the feasibility of irrigating that land going back to a 1920 comprehensive study by C.A. Engle, a United States Indian Irrigation Service engineer. Nearly 36,000 acres of that project already were being successfully irrigated, and concrete proposals to develop the remainder of the 100,000 acres existed. As for other areas on the Colorado River Indian Reservation, Merchant testified that in 1951 the BIA had requested the United States Bureau of Agricultural Economics to conduct an economic study, and that thereafter the BIA initiated its own economic studies of land areas that would require pumping plants for irrigating the land, *i.e.*, 12,478 acres of Arizona mesa lands, 8,060 of California mesa and bottom lands, and 4,060 acres of California limitrophe (river) lands. With respect to the Fort Mojave Indian Reservation, the BIA apparently relied upon a 1952 Bureau of Reclamation study incorporating an economic evaluation for irrigating 2,160 acres in the Nevada portion of that reservation.

Based on the economic reports he had located, Merchant expressed the opinion that the BIA experts had engaged in an appropriate PIA economic analysis. Merchant had been unable to locate any economic studies for the Arizona and California portions of the Fort Mojave Indian Reservation. But both Merchant and Dr. Mesghinna expressed the opinion that in the 1950s much of the necessary economic information for establishing plaintiffs' PIA claim in *Arizona I* may have been communicated informally, *e.g.*, through letters, meetings, or telephone conferences, to the land classifiers and not incorporated

---

**8.** In the absence of an actual set of land classification standards, plaintiffs appear to rely upon the land classification studies developed in *Arizona II*. Plaintiffs argue that the 1956 Land Capability Standards were utilized to determine arability in both *Arizona I* and *Arizona II*. But the evidence indicates that the Land Capability Standards in *Arizona II* incorporated post–1950 technology and in addition, that that land classification methodology was inconsistent with the basic methodology utilized in *Arizona I*. Thus, it is not appropriate to use the *Arizona II* results to determine what land should have been found arable and/or irrigable in *Arizona I*.

into written reports. In addition, both experts suggested that the PIA considerations that come into play prior to economic analysis, *e.g.*, soils and engineering factors, may have resulted in the early elimination of lands that otherwise would have received economic analysis. These gaps in the evidence leave the court in the dark as to certain details of the BIA's reasoning on the issue of economic analysis. But based upon the available evidence, the court cannot conclude that the BIA was unreasonable or imprudent in its use of economics when representing the Tribes' interests in *Arizona I*.[9]

### (3) *Sprinkler Technology*

Plaintiffs fault the BIA experts for not making a claim to 7,196 acres of sandy and rough mesa lands on the Tribes' reservations which plaintiffs contend could have been rendered arable by use of water sprinklers for irrigation. Plaintiffs contend that the BIA suggested using sprinklers for the Fort Apache Indian Reservation in *Arizona I* and that the Bureau of Reclamation generally had endorsed the use of sprinklers as a possible means for irrigating land. But defendant presented expert testimony to the effect that sprinklers would not have been considered a viable technology for the Tribes' reservations at the time evidence was being taken in *Arizona I*.

Dr. Mesghinna testified that as late as 1949, in a study relating to the Yuma Mesa Division of the Gila Project in Arizona, the Bureau of Reclamation had found sprinkler irrigation unsatisfactory on land comparable to the Tribes' reservation land. Sprinklers were found economically unfeasible because of high labor costs associated with having to move the sprinklers frequently. Frequent sprinkler movement was necessary on these lands because the soil had a low water holding capacity (*i.e.*, the ability to retain and store moisture) and a high rate of evapotranspiration (*i.e.*, the loss of water through evaporation and transpiration). Because these same conditions existed on the Tribes' reservations, and because the Tribes' land was of a poorer quality, Dr. Mesghinna concluded that using sprinklers on the Tribes' reservations would have been equally infeasible from an economic perspective.

Plaintiffs' experts suggested that if the BIA experts had considered utilizing "mechanically moved" sprinklers called "side-roll sprinklers" then the pertinent labor costs would have decreased sufficiently to permit economic irrigation of the land. But at the pertinent time period, "mechanically moved" sprinkler systems were still in the experimental stage of development and were not an established irrigation technology for land conditions existing in the lower Colorado Riv-

9. Plaintiffs also allege that the BIA experts overlooked mesa lands on both reservations that required water to be pumped more than 240 feet for the purpose of irrigating the soil. Plaintiffs suggest that non-Indians were farming mesa lands requiring up to 400–foot pump lifts and that pumping the water above 240 feet would have been economically feasible for any given land parcel. But the trial evidence supports the conclusion that the 240–foot cutoff was reasonable. Plaintiffs base their argument to the contrary on testimony from *Arizona I*, in which Rupkey stated that he would regard the upper limit on pumping lifts in the Colorado River Valley to be 300 to 400 feet. But Rupkey qualified this testimony by explaining that most pumping lifts were approximately 200 feet or over and that he had decided to stop at 240 feet because of topography and boundary considerations. One of plaintiffs' experts, Kersich, relied upon Rupkey's testimony and also testified that in the 1950s the Bureau of Reclamation considered a pumping lift of 400 feet for an irrigation project near plaintiffs' reservations. But defen-

dant's economic witness, Merchant, testified that while the irrigation project to which Kersich referred had plans detailing pumping lifts over 400 feet, the project, as built, actually had pumping lifts under 240 feet. Indeed, in its 1952 report on the Nevada portion of the Fort Mojave Indian Reservation, the Bureau of Reclamation found 2,500 acres of sloped land to be unsuitable for irrigation development because, *inter alia*, "the higher pump lift (as much as 400 feet for the higher lands) required for supplying water to the extremely sandy soils which have a low water-holding capacity. . . ." Merchant also suggested that the costs of providing pumping lifts over 240 feet for the mesa lands would likely have exceeded the benefits for each land parcel. Moreover, Kersich admitted that because of factors such as pipe friction and design, the pumping lifts would have to be greater than 240 feet in order to pump water to a height of 240 feet, and that he had not checked the economic feasibility of irrigating lands above the 240–foot elevation for the Tribes' reservations.

er Basin.[10] Significantly, in *Arizona II*, even using 1980 sprinkler technology, plaintiffs' current experts classified as nonirrigable the majority of 3,124 acres of mesa lands on the Colorado River Indian Reservation, lands which plaintiffs herein argue the BIA should have classified as irrigable. As to plaintiffs' contention that the BIA experts had proposed sprinklers for the Fort Apache Indian Reservation, Dr. Mesghinna expressed the opinion that due to the dissimilar climatic and soil conditions, the probability that sprinkler irrigation would have been feasible on the Fort Apache Indian Reservation was much higher than on the Tribes' reservations. Again, the record is not complete with respect to the BIA's relevant thought process regarding sprinkler technology when litigating *Arizona I*. But based on the totality of the evidence, the court simply cannot conclude that the BIA acted improperly when it failed to argue that sprinkler technology would render the disputed land practicably irrigable.

#### (4) *Flooding*

Plaintiffs contend that the BIA experts erred when they excluded approximately 5,188 acres from the *Arizona I* PIA claim based on the use of the land for flood detention or routing for flash floods off the mesas east of the Colorado River Indian Reservation. Plaintiffs argue that engineering techniques were available in the 1950s to surmount any flash flood problems encountered on these lands. Plaintiffs contend that engineers could have constructed drains, levees, and floodways that would have provided sufficient protection from any flood waters.

Dr. Mesghinna testified that the BIA experts in *Arizona I* chose to exclude these lands for flood detention or floodways in order to protect the Colorado River Indian Reservation's main 100,000–acre irrigation project. When questioned on cross-examination, Dr. Mesghinna admitted that if he had been faced with the flash flood problem he might have considered other engineering al-

ternatives such as those plaintiffs now suggest. But Dr. Mesghinna also advised that it is difficult to judge the actions of the BIA experts regarding the flash flood lands because based upon the knowledge then available, the BIA experts perhaps made a reasonable choice in omitting the land. Dr. Mesghinna explained that the two largest flood-producing washes are the Bouse Wash and the Tyson Wash, and that at the time of the *Arizona I* litigation there were some "pretty scary flash floods." One of the larger flash floods recorded for the Bouse Wash occurred on July 17, 1957, and had an estimated peak flow of 20,000 cubic feet per second (cfs). For comparison of the extent of the flooding, Dr. Mesghinna stated in his pretrial report that the average flow of the Colorado River from 1935 to 1991 was 12,660 cfs. In addition, in both 1955 and 1957, heavy storms caused flash floods in the Tyson Wash that overflowed the detention basins, broke the levees, and damaged project lands.

Again, hindsight can support an argument that the BIA might have made a water claim for the flood lands. But based upon all of the evidence, the court cannot conclude that the BIA acted imprudently in reserving the lands for flood detention or routing for flash floods instead of claiming water rights for them.

#### (5) *Lands Adjacent to the Colorado River*

Plaintiffs fault the BIA experts for not claiming water rights for approximately 12,655 acres of reservation lands adjacent to the Colorado River. At trial, Dr. Mesghinna outlined the various reasons why the BIA experts excluded these river lands from its PIA claim in *Arizona I*. With respect to the Fort Mojave Indian Reservation, most of these lands were either still under water or within the Colorado River channel itself. Given the existing or likely flow of the Colorado River on these lands, the BIA made the determination that these lands would not be

---

**10.** Dr. Mesghinna observed that the Bureau of Reclamation operated a sprinkler demonstration project between 1956 and 1960 on the Wellton–Mohawk Division of the Gila Project which used mechanically moved sprinklers. But this project was only a demonstration and the annual costs initially exceeded the annual returns. Thus, this irrigation technology would not have appeared feasible when the BIA experts were preparing plaintiffs' water rights claim in *Arizona I*.

useful for growing crops and thus were not practicably irrigable. As to the Colorado River Indian Reservation, these river lands were located between the Colorado River and a levee the federal government had constructed to protect the main 100,000–acre irrigation project from flooding. The primary reason the BIA did not claim these lands as practicably irrigable was that the lands could serve as a "buffer zone" where timber and other material on the land would slow any flood waters from the Colorado River that might run against the levee. The BIA chose such a use of these lands because of the economic importance of preserving the 100,000–acre irrigation project behind the levee structure. A secondary reason for not claiming these lands involved the possible use of these lands as recreational areas. In 1955, the Colorado River Tribal Council had indicated its intent to develop the river lands for recreational purposes.

Dr. Mesghinna acknowledged that based on the current state of engineering knowledge, today's engineers would not have left trees and other materials in the floodway to help control flood waters. Indeed, Dr. Mesghinna expressed the opinion that the presence of such materials might raise the height of flood waters against the levee and perhaps damage the levee. But Dr. Mesghinna further noted that leaving the growth on the river land may have been consistent with 1950s practice. Moreover, Dr. Mesghinna testified that in the 1950s the BIA experts believed that based upon the historical flooding of the Colorado River, there might be extensive and regular flooding on these river lands. Therefore, Dr. Mesghinna found it reasonable for the experts not to claim these lands for crop use. Only now, looking back at the BIA's choices at the time, can one see the extent of the benefits of other flood control measures such as dams and channelization of the Colorado River.[11]

Dr. Mesghinna also expressed the opinion that the BIA experts' decision to exclude these river lands was linked in part to an effort to support the credibility of the Tribes' claims in *Arizona I*. In the mid–1940s, a flooding problem arose between the Colorado River Indian Reservation and the Palo Verde Irrigation District located on the California side of the Colorado River. The Palo Verde Irrigation District constructed a temporary dam to divert water from the Colorado River. The resulting·increase in the water level led to flooding, waterlogging, and drainage difficulties on the opposite side of the Colorado River, *i.e.*, the Arizona side of the Colorado River Indian Reservation. The Colorado River Indian Tribe, the Palo Verde Irrigation District, the BIA, and the Bureau of Reclamation, after years of arguing over how to resolve this situation, ultimately reached a compromise. The BIA and the Colorado River Indian Tribe acceded to the construction of a permanent dam (the Palo Verde Dam) so long as the water level of the Colorado River was lowered slightly and a levee with an interceptor drain was built to protect the reservation lands from flooding. Thus, after years of argument, the BIA and the Colorado River Indian Tribe convinced Congress to appropriate funds to build a levee on the Arizona side of the Colorado River Indian Reservation (the eastern side of the Colorado River) based upon a real and present fear of flooding.[12] Thus, if the BIA experts proceeded to claim this land between the Colorado River and the levee as practicably irrigable acreage in *Arizona I*, such a claim could appear inconsistent with the Colorado River Indian Tribe's previous representations, reflect negatively on the BIA experts' credibility in court, and hinder the government in its effort to secure the highly desired PIA standard.

11. Channelization is the artificial stabilization of a river channel, generally through dredging (the deepening of the river channel), and bank stabilization through the deposition of "rip-rap" (irregular rock that is used for bank and erosion protection).·

12. *See* Act of Aug. 31, 1954, Pub.L. No. 83–752, ch. 1170, 68 Stat. 1045, 1046 (1954) (Sec. 4.

provides that "[t]he Secretary [of the Interior] is further authorized— ... (b) to construct levees, ditches, and other works required to protect the lands of the Colorado River Indian Reservation upstream from the diversion dam authorized in section 1 of this Act against Colorado River flows of seventy-five thousand cubic feet per second and to provide a means of draining said lands").

Plaintiffs point out that the BIA experts claimed some river lands on the California side of the Colorado River Indian Reservation (the western side of the Colorado River) north of the Palo Verde Irrigation District as practicably irrigable. Unlike the PIA lands on the Arizona side, however, the California lands lacked a 100,000–acre irrigation project that would justify additional flood protection measures, *i.e.*, sacrificing riverfront lands to protect interior lands from flooding. Also, unlike the Arizona side on which Congress had recently paid for 28 miles of levee and 21 miles of drainage, the California side had only a minimal levee construction. The BIA's failure to make a claim for the river lands is perhaps the most suspicious of all of the BIA's decisions in the *Arizona I* litigation. But based on the totality of the evidence, the court cannot conclude that the BIA's actions amounted to a breach of trust.

## VIII.

Plaintiffs' rationale for pursuing this litigation is perfectly understandable. Water rights in the Colorado River Basin are extremely valuable and plaintiffs believe that they were allocated less water rights than they were entitled. The Tribes' reservations appear economically depressed and an increase in water rights could be a key to future industrialization. Moreover, plaintiffs apparently did not choose to have the United States represent them in *Arizona I* and were unable to select their own counsel. Perhaps most frustrating from plaintiffs' perspective is that looking back, an argument can be made that the United States could have presented the Tribes' PIA claims in a more aggressive manner than it did. The United States apparently received water rights for all of the acreage it claimed to be practicably irrigable and the concern arises that if the United States had simply pushed harder and sought water rights for additional acreage, it might have received at least some additional water rights. But this is the seducing aspect of hindsight. When viewing the past, one often takes for granted what actually was accomplished and instead focuses exclusively on possible opportunities lost.

Reconstructing a complete picture of what happened over three decades ago, including why certain decisions were made and why certain positions were taken, has proved impossible. When the court considers all of the evidence presented at trial, the court cannot say with certainty that the United States did not commit any errors. But at the same time, the court cannot conclude that the United States acted in an unreasonable or imprudent manner in representing the Tribes' interests. After reviewing the entire record, the court concludes that in representing the Tribes' interests in *Arizona I*, the United States acted diligently and with vigor and considerable skill. To the extent that some errors can be argued to have been made, such errors appear far more likely to have occurred and larger in scope when viewed under the sharp focus of hindsight rather than when placed in an appropriate historical context. Any such errors that may have occurred appear to be errors of judgment which counsel, acting in a reasonably prudent manner, potentially can make in the course of complex litigation. Plaintiffs simply have not carried their burden to establish that the United States' representation of the Tribes' interests in *Arizona I* constituted a breach of the trust obligations it owed plaintiffs. Hence, plaintiffs have failed to demonstrate a breach of trust.

### Conclusion

For the reasons set forth above, the Clerk of the Court shall enter judgment dismissing plaintiffs' complaints. No costs.

IT IS SO ORDERED.